John BROCKEN, America Brocken,
and Olga Martinez, Appellants,

v.

ENTERGY GULF STATES, INC.
and Cooper Power Systems,
Inc., Appellees.

No. 09–04–499 CV.

Court of Appeals of Texas,
Beaumont.

Submitted May 25, 2006.

Decided July 13, 2006.

James A. Morris, Jr., John A. Cowan, Ed Fisher, Provost & Umphrey Law Firm, LLP, Beaumont, for appellants.

Curt Webb, Anne M. Pike, Troy Ford, Beck, Redden & Secrest, LLP, Houston, Eric Paul Edwardson, Sheldon, Dunham & Edwardson, LLP, Beaumont, for appellees.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

In this personal injury case, we must decide whether the trial court properly granted the defendants' motions for summary judgment. We affirm the summary judgment granted to Cooper Power Systems, Inc., ("Cooper"), and hold that the plaintiffs failed to produce evidence that Cooper breached any duty to provide

warnings or instructions regarding Cooper's product. Plaintiffs also failed to show that Entergy Gulf States, Inc., ("Entergy"), the owner of the electric lines, had actual knowledge of the dangerous activity conducted on its premises by North Houston Pole Line Corp., (NHP), an independent contractor. The trial court's summary judgment granted to Entergy is also affirmed.

## THE CONSTRUCTION PROJECT

On August 13, 2001, John Brocken suffered an injury during a construction project that involved moving an energized distribution line from an old pole to a new pole. John was part of a three-man crew employed by NHP. The crew also included Thomas Ferguson, the job foreman, and Clayton Demouchette. All three NHP crew members were experienced journeyman linemen.

Entergy hired NHP to install a new pole and move existing lines without interrupting Entergy's electrical service to its customers. To execute the work, NHP provided a three-man crew, a digger truck to dig the hole for the new pole, and a bucket truck to lift two of its employees to the distribution lines to move them.

NHP's safety manual requires its vehicles, including insulated buckets, to be grounded while near contact distance of an energized electrical circuit. NHP's safety manual required grounding the bucket truck with a five-foot screw-type ground rod; or, with a regular half-inch ground rod; or, by connecting the ground wire from the bucket truck to the system neutral. Apparently, the NHP crew followed none of these choices, and instead attached the ground wire from the bucket truck to a copper wire on the new pole.

While the crew was moving an electric line to the new pole, a fault occurred. The electricity flowed through the new pole, to the ground wire, to the bucket truck. The electricity found a path to ground through the tires of the bucket truck.

Shortly after the fault, Demouchette suffered an electrical injury when he apparently contacted the energized bucket truck. Brocken and Ferguson, who were in the bucket approximately fifty feet in the air near the lines, lowered the bucket to the top of the cab of the truck. While being lowered in the bucket, Ferguson saw the tires on the bucket truck were on fire and noticed Demouchette lying by the front left tire of the truck. At that point, Ferguson knew that "there was electricity running through the truck." Brocken fractured his right ankle when he jumped from the top of the bucket truck to the ground.

The summary judgment evidence included the depositions of Ferguson and Brocken. Ferguson testified that Demouchette attached the ground wire from the bucket truck to a wire that ran the length of the new pole. Ferguson testified that he did not consider the truck properly grounded. Brocken testified that he "would have either used a ground rod or a screw ground."

## THE RECLOSER

In 1982, Entergy's predecessor, Gulf States Utilities, purchased a "recloser," a device that Cooper manufactured. In 1999, Entergy installed the recloser on the electric distribution line in the vicinity of this project. A recloser is "a switch or circuit breaker that establishes an electrical circuit again manually, remotely, or automatically after an interruption of service." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1896 (2002). A recloser monitors the current, trips open at a preset threshold, and then recloses if the fault disappears. In this case, the recloser's

settings allowed it to operate, or trip, if the amperage running through the recloser reached 280 amperes.

Typically the faults on electric distribution lines are caused by lightning strikes, contact with tree limbs, or short circuits across phases of the lines. When a recloser opens, it de-energizes the line; and, although the setting can be adjusted, a recloser typically stays open about two seconds before reclosing. Thus, reclosers allow utilities to restore electric power quickly by temporarily interrupting a line's electric current in response to occurrences that would otherwise interfere with the utility's distribution of electricity to customers.

Cooper supplied Entergy with information regarding the amount of current and amperage required to trip Cooper's reclosers. The plate affixed to the recloser utilized here indicates that Cooper rated it for 140 amps of continuous current. According to Bobby Singletary, an Entergy witness and Entergy's area design manager, an Entergy engineer specifies the reclosers placed on Entergy's electric lines and understands a recloser's basic operations. Singletary testified that Entergy understood that the minimum trip setting on Cooper's reclosers was two times the continuous current rating. The continuous current rating on the recloser here was 140 amperes; and, it would trip at amperages of 280, or more.

Before beginning the transfer of the lines, Ferguson requested that Entergy place the recloser in its "one shot" mode. Entergy's employee, James Murphy, changed the recloser to its "one-shot" mode. When placed in this mode, the recloser in this particular case would not automatically reset and would remain open after tripping in response to 280 amperes or more of current. In the open position, electricity would not flow through the lines. The recloser was approximately two miles from NHP's work site. Immediately after the accident, Ferguson went from the work site to the recloser. As Ferguson prepared to trip the recloser manually, he saw the switch move from the closed to the open position.

The Brockens agree that Entergy placed the recloser in the "one-shot" mode prior to NHP's moving the lines to the new pole. After the accident, Entergy tested the recloser and determined that it operated properly. The recloser did not open until the fault current reached the recloser's trip threshold.

## THE BROCKENS' CLAIMS AGAINST COOPER

John Brocken, his wife, America, and his daughter, Olga Martinez, assert a marketing defect claim against Cooper. The Brockens claim that Cooper marketed the recloser as a safety device, but that the recloser had insufficient warnings. Specifically, the Brockens assert that electrical workers such as John believe that reclosers will trip when a fault occurs and, based on that belief, rely upon reclosers to de-energize a line immediately when a fault occurs.

Cooper moved for a traditional summary judgment on the Brocken's marketing defect claims, arguing in part that it had no duty to warn John because "a manufacturer has no duty to warn of the dangers and risks associated with another's products." Cooper's motion for summary judgment also asserts that "the lack of a warning was not a 'producing cause' of this accident." In its brief, Cooper argues that users of reclosers are aware that reclosers do not protect against the possibility that current may exist under some circumstances when an electrical fault on a line occurs. Cooper contends that it has no duty to warn its users of information about which they are already aware. Cooper

further asserts that any alleged failure to warn did not cause John's injury, because John knew the recloser did not trip, and therefore chose to jump to avoid the possibility of being shocked. Finally, Cooper asserts that there is no evidence that the recloser was unreasonably dangerous.

### THE BROCKENS' CLAIMS AGAINST ENTERGY

As to Entergy, the Brockens asserted negligence and products liability theories in their complaint. As a business invitee, the Brockens assert that Entergy failed to provide John with a safe workplace. They also contend that Entergy negligently failed to warn John of a dangerous condition on its premises. The Brockens claim that the dangerous condition is Entergy's knowledge that linemen inappropriately rely on the use of reclosers placed in the "one-shot" mode as safety devices.

In combined traditional and no-evidence motions, Entergy moved for summary judgment on the Brockens' claims. Entergy's summary judgment is premised, in part, on its contention that Chapter 95 of the Texas Civil Practice and Remedies Code creates limitations on the liability of a premises owner to employees of independent contractors. Entergy contends that it exercised no control over NHP's work, and had no actual knowledge of the danger r condition that caused the accident. Entergy's motion also asserts that any allegation it failed to warn NHP regarding characteristics associated with the recloser was not a legal cause of John's injury. With respect to the Brocken's product liability claims, Entergy asserts that electricity is not a product and that it is a user of the recloser, not its manufacturer.

### TRIAL COURT RULES ON SUMMARY JUDGMENT MOTIONS

On July 15, 2004, the trial court granted Cooper's motion for summary judgment and did not explain the basis of its ruling. On the same date the trial court granted Entergy's motion for summary judgment without explaining the basis for its ruling.

On appeal, the Brockens assert that their summary judgment evidence created issues of material fact regarding whether Cooper marketed the recloser with insufficient warnings. With respect to Entergy, the Brockens assert that the existence of fact issues as to Entergy's negligence in failing to warn linemen regarding the recloser's not protecting against certain faults requires that we reverse the trial court's summary judgment.

### SUMMARY JUDGMENT EVIDENCE AND STANDARDS OF REVIEW

▌ If a trial court does not specify the grounds upon which it bases its summary judgment, the appealing party must show that each independent ground alleged in the respective defendant's motion for summary judgment is insufficient to support the trial court's judgment. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000); *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995). On appeal, the reviewing court will affirm the summary judgment if any ground raised by the prevailing party in its summary judgment motion has merit. *Bradley v. State ex. rel. White,* 990 S.W.2d 245, 247 (Tex.1999); *Star–Telegram,* 915 S.W.2d at 473.

▌ With respect to the sections of Entergy's and Cooper's motions that are traditional motions for summary judgment under Rule 166a(c), "[s]ummary judgment is appropriate only when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law." *D. Houston, Inc. v. Love,*

92 S.W.3d 450, 454 (Tex.2002). In reviewing the evidence presented, we "must resolve every doubt and indulge every reasonable inference in the nonmovant's favor. All evidence favorable to the nonmovant will be taken as true." *Id.* (citation omitted). The question on appeal is "whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action." *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *see* TEX.R. CIV. P. 166a(c). We review the decision of the trial court under a de novo standard. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex. 1994).

■■■ With respect to those portions of Cooper's and Entergy's motions that constitute no evidence motions under Rule 166a(i), we note that "[a] no-evidence summary judgment is essentially a pre-trial directed verdict...." *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003). The nonmovant must produce more than a scintilla of evidence to defeat a no-evidence motion. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). "[M]ore than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex. 1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)). We review a no-evidence summary judgment de novo by construing the record in the light most favorable to the respondent and disregarding all contrary evidence and inferences. *Oliphint v. Richards,* 167 S.W.3d 513, 515–16 (Tex.App.-Houston [14th Dist.] 2005, pet. denied); *Reynosa v. Huff,* 21 S.W.3d

510, 512 (Tex.App.-San Antonio 2000, no pet.).

## APPLICATION OF LAW TO FACTS REGARDING COOPER

Before the hearing on the summary judgment motions, the Brockens waived their complaints of manufacture and design defect against Cooper. The Brockens' remaining assertion was a marketing defect claim. With respect to this claim, Cooper's motion for summary judgment asserts that Cooper has no duty to warn that its recloser will not trip in response to any surge in current.

Here, Cooper marketed a recloser to a utility that subsequently installed it in an electrical distribution system. With respect to component-parts manufacturers, the Texas Supreme Court distinguishes between duties owed to consumers and duties owed to sophisticated users. The Texas Supreme Court states that "if he component-part manufacturer does not participate in the integration of the component into the finished product, it is not liable for defects in the final product if the component itself is not defective." *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 683 (Tex.2004) (*citing* Restatement (Third) of Torts: Products Liability § 5 (1998); *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 334 (5th Cir. 1998)); *see Toshiba Intern. Corp. v. Henry,* 152 S.W.3d 774, 778 (Tex.App.-Texarkana 2004, no pet.); *Bennett v. Span Indus., Inc.,* 628 S.W.2d 470, 473 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.). With respect to marketing defects, the Texas Supreme Court has stated: "When the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks." *Humble Sand &*

*Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 183 (Tex.2004).

■■■ The Brockens do not allege that Cooper participated in the design of Entergy's electrical distribution lines. "It is not proper to extend the doctrine of strict liability to the supplier of a component part used in a product according to the design of the product's manufacturer when the injuries are caused by the design of the product itself, rather than by a defect in the component." [1] *Bostrom Seating,* 140 S.W.3d at 683.

The summary judgment evidence showed that Entergy, not Cooper, specified the recloser to be placed on the line. In this case, the recloser did not open and interrupt the current because Entergy did not design the distribution system to shut down when certain faults occurred. The presence of electricity in the line after a fault occurred is due to the design of the distribution system, not a defect in the recloser. Undisputed evidence shows that the recloser on the electric distribution line operated as designed.

■■■ Nevertheless, a component part could be defective by virtue of the manner in which it is marketed to its users. Manufacturers of component parts are generally required to supply reasonable instructions and warnings to their component-parts buyers regarding the risks associated with the use of their products. *Henry,* 152 S.W.3d at 783; Restatement (Third) of Torts: Products Liability § 2(c) (1998). The duty is limited, however, and does not require warning or instructing about every characteristic of a component's operation. The Supreme Court has expressly recognized differences between the duties of equipment manufacturers to end users and the duties

of component-part manufacturers to their buyers with respect to manufacturing and design defects, and we believe similar distinctions apply regarding marketing defect claims. *See Bostrom Seating, Inc.,* 140 S.W.3d at 683. The *Bostrom* Court cited section 5 of the Restatement (Third) of Torts: Products Liability, with approval. *Id.* Comment b of Section 5 describes the limitation on the component-parts manufacturers' duty to warn as follows:

> [W]hen a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it.

Restatement (Third) of Torts: Products Liability § 5, cmt. b (1998). Thus, if Entergy inappropriately used the recloser to protect linemen against all faults, as alleged by the Brockens, Cooper had no duty to warn Entergy that the recloser was inappropriate for this special purpose.

■■■ In addition, a manufacturer has no duty to warn of a product's obvious risks. *Humble Sand & Gravel,* 146 S.W.3d at 183; *Sauder Custom Fabrication, Inc. v. Boyd,* 967 S.W.2d 349, 351 (Tex.1998) (per curiam). A risk can be obvious to those who have special training. *Humble Sand & Gravel,* 146 S.W.3d at 183.

■■■ The court determines as a matter of law whether the user appreciates an obvious risk, unless the evidence raises fact issues that must be resolved. *Id.; Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 383 (Tex.1995). No duty to warn exists where a user is already aware of the risk or the risk is obvious. *Boyd,* 967 S.W.2d at 351; *Shears,* 911 S.W.2d at 383.

---

**1.** Because we dispose of the case on other issues, we do not reach the question of wheth-

er the alleged marketing defect caused John's injury.

In this case, the evidence showed that the relevant Entergy personnel responsible for designing the distribution system knew the recloser would not trip unless the fault created 280 amperes of current or more in the line. The summary judgment evidence showed that Cooper provided information to its user, Entergy, regarding its reclosers so that users like Entergy could select the operating characteristics it wanted with respect to the recloser's interruption of electrical current. The summary judgment evidence is undisputed that relevant Entergy employees used this information to decide the settings used on the reclosers that Entergy placed in its distribution system.

Using a recloser set to open at a preset level necessarily creates a risk that it will not open at levels below its setting. Electricity will obviously be present downstream of a recloser if the contacts on the recloser are closed. Cooper's summary judgement evidence shows that Entergy employees responsible for the design of the electric distribution system appreciated the obvious risk that a recloser set to open at 280 amperes would not open at fault currents of less than 280 amperes. ▆▆▆▆ In response to Cooper's evidence, the Brockens had to show that Cooper had a duty to give adequate warnings about its product's dangers that it knew of or should have known about, which failure rendered the recloser unreasonably dangerous as marketed. *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 605 (Tex.1972). The Brockens failed to show that Cooper, a component-part manufacturer, under these facts and circumstances, had a duty to warn Entergy of the dangers of using a recloser for the special purpose that the Brockens assert Entergy used it. Cooper also established that Entergy was aware of the risk and that the risk is obvious to an electric utility. Generally, a component-part manufacturer is not required to warn its users of obvious risks or of characteristics already known by the user. The trial court did not err in granting Cooper's traditional summary judgment on these grounds.

▆▆▆ We need not address other arguments by the Brockens that their summary judgment response raises material facts as to other essential elements of their case against Cooper. We also do not address other arguments by Cooper that the trial court correctly granted its motion for summary judgment. Because a trial court acts correctly in granting a summary judgment when a defendant proves it had no duty to plaintiffs, or that it breached none of its duties, whether the trial court erred or correctly granted the motion on other grounds is moot. We overrule John Brocken's first issue—namely, that the trial court erred in granting summary judgment to Cooper.

## APPLICATION OF LAW TO FACTS REGARDING ENTERGY

It is undisputed that Entergy owned the electric distribution lines involved in the suit and that Brocken was an employee of a contractor that Entergy hired to construct, renovate, or modify an improvement to real property. The Brockens do not contend that Chapter 95 of the Texas Civil Practice & Remedies Code is inapplicable to their claims against Entergy. Section 95.003 provides:

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from

the failure to provide a safe workplace unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 2005).

In its motion for summary judgment, Entergy asserted that there was no evidence that it had actual knowledge of the danger resulting in Brocken's injury and cited Rule 166a(i) as authority for judgment in its favor. Under Chapter 95, the premises owner must exercise or retain control over the manner of the work, *and* have *actual knowledge* of the danger or condition of the premises that causes the injury. TEX. CIV. PRAC. & REM.CODE ANN. § 95.003(1), (2). The Brockens assert that the danger on the premises consisted of Entergy's knowledge that electrical line workers such as John Brocken falsely relied on reclosers set in a "one-shot" mode to recognize a fault and de-energize the

line.[2] John asserts that had he known about the current interruption characteristics of the recloser, the NHP crew could have taken precautions to ground its work differently.[3]

On appeal, the Brockens assert that Entergy knew that linemen relied on a recloser set in "one-shot" mode to provide a safe working environment for workers in the proximity of a fault. As evidence of Entergy's knowledge of the danger, the Brockens cite the deposition testimony of NHP's foreman, Ferguson, who testified that the recloser was put in a "one-shot" mode "[s]o, if something does happen, the electricity will turn off and not come back on." Ferguson also described his understanding of the recloser's operation when it was in the "one-shot" mode:

> A one-shot means that the apparatus is set to activate one time. If electricity goes to ground, then it will trip the recloser and not turn the electricity back on. When it's in a normal state, it will operate at least three times. It will turn off, wait a couple of seconds, turn back on.

Demouchette had a similar understanding of a recloser's operation. In his deposition, Demouchette testified that a "one-shot" meant "if something happens, yeah, the line just shut[s] itself down."

---

**2.** We do not reach the issue of whether Chapter 95 encompasses dangers that arise from negligently conducted activities as contrasted with claims for premises defects, as it is not one of the bases for Entergy's motion for summary judgment and is not argued by the parties on appeal. *See Rueda v. Paschal*, 178 S.W.3d 107, 110 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (interpreting "danger" and "condition" as synonymous, and stating that the presence of a ladder was not a premises condition). We express no opinion regarding whether the legislature intended to use "danger" and "condition" as synonyms in Section 95.003(2). Tex. Civ. Prac. & Rem.Code Ann. § 95.003(2). If Chapter 95's exceptions allow

an independent contractor's injured employee's claim because the owner is aware that the contractor's activity presents the contractor's employee with a danger, which both parties have assumed, the actual knowledge requirement of Chapter 95 remains a necessary element of establishing a claim against a premises owner under Chapter 95.

**3.** Entergy also argued that any alleged deficiency in warning did not proximately cause the accident. We do not reach the issue because it is not necessary to the resolution of the appeal, but note that NHP, Brocken's employer, provided grounding instructions that were not followed.

The Brockens point us to portions of the sworn report of their expert, Judd Clayton, an electrical engineer, for evidence they contend creates a fact issue regarding Entergy's knowledge of the danger. Clayton's report states:

> Both Entergy and North Houston Pole Line employees involved in this incident were of the perception/expectation that a recloser placed on "one-shot" would quickly de-energize the line and thus, provide a safe working environment for those who happen to be working in proximity of a fault of the nature of the one that occurred.

Finally, the Brockens also point us to the testimony of two Entergy employees, James Murphy and George Sanchez, included in the Brockens' summary judgment response. The Brockens argue that the testimony of these employees shows that Entergy knew of the danger that the Brockens complain of here.

The Brockens argue that the deposition testimony of James Murphy, the Entergy employee who placed the recloser in the "one-shot" mode, is evidence that Entergy knew of the danger. Murphy testified that the purpose of placing the recloser in the one-shot mode was so that "if something goes wrong, it ensures that the line will not come back energized. If it sees a fault, it will trip out and stay out." With respect to George Sanchez, he testified that he understood the one-shot setting on the recloser to offer "protection for us." Sanchez was the Entergy employee who tested the recloser after the incident.

█ To meet Chapter 95's actual knowledge requirement with respect to a negligent activity, the Brockens must show: (1) Entergy had actual knowledge that the crew transferring the distribution lines had a false expectation that the recloser would open in response to any fault on the electric line; (2) Entergy knew of the

danger to NHP's crew resulting from the crew's false expectation; and (3) the crew's working under the false expectation proximately caused the accident. We do not agree that the summary judgment evidence offered by the Brockens is evidence showing Entergy knew of NHP's crew's false expectation regarding the recloser's operation, or that the Brockens showed Entergy knew of the danger the false expectation created to the crew engaged in transferring its electric lines.

The depositions of Ferguson and Demouchette show, at most, that they were unaware that the recloser required sufficient fault current to reach the recloser's trip threshold. The testimony does not demonstrate that Entergy was actually aware of the crew's misapprehension, and there is no testimony that prior to the incident the crew members informed anyone at Entergy of their apparent incorrect understanding of the recloser's operation.

Clayton's opinion that employees of Entergy "involved in this incident," and NHP's crew, misunderstood the details of the recloser's operation does not create a fact issue as to Entergy's knowledge of the NHP's crew misapprehension regarding the recloser's operation. Clayton did not express the opinion that Entergy was actually aware that NHP's employees misunderstood the recloser's operation prior to the incident. Clayton's report cannot fairly be interpreted to infer that Entergy knew that NHP's employees were working on the electric line under the misapprehension that the recloser would protect them from any fault, however small.

The testimony of Entergy's employees, Murphy and Sanchez, also does not support any inference that Entergy possessed actual knowledge of the danger about which the Brockens complain. Murphy

was not questioned in his deposition about whether the recloser would trip in response to any fault on the line. If it can be inferred from Murphy's general testimony that he thought the recloser would open in response to any fault, the inference is that he misunderstood the characteristics of the recloser's operation. Whether Murphy understood or misunderstood the actual characteristics of the recloser, his testimony does not address his knowledge of NHP's employees' assumptions regarding the recloser's operating characteristics. There is also no testimony that Murphy had any contact with the NHP crew prior to the incident.

Sanchez's testimony shows that he tested the recloser after the accident. There is no testimony that he had any involvement in the work of NHP to transfer the lines before the incident or that he even knew of the project prior to Brocken's injury. Sanchez did not address what he knew of NHP's crew's knowledge of the recloser's operation. Sanchez's testimony that he understood the recloser to offer protection does not show or tend to establish that he knew the NHP crew was operating under a false belief regarding the recloser's operating characteristics before the accident.

■ Entergy's motion for summary judgment established that chapter 95 applies to the Brockens' claims. Once Entergy established that it was a premises owner and hired an independent contractor, the Brockens had the burden to present controverting evidence. To properly respond to Entergy's no evidence motion, the Brockens were required to produce evidence establishing an exception to chapter 95. See Tex. Civ. Prac. & Rem.Code Ann. § 95.003; *Phillips v. Dow Chemical Co.*, 186 S.W.3d 121, 133 (Tex.App.-Houston

[1st Dist.], no pet.); *Rueda,* 178 S.W.3d at 111.

We hold that the Brockens presented no summary judgment evidence concerning Entergy's *actual* awareness of the danger that the Brockens contend arose out of NHP's activity in moving the electric lines. The trial court correctly granted Entergy's no evidence motion for summary judgment based on Chapter 95 of the Texas Civil Practice & Remedies Code.

We need not address other arguments by the Brockens that their summary judgment response raises material facts as to other essential elements of their case. We need not address Entergy's other arguments regarding whether it had control or the right to control NHP's work, or regarding causation. Because a trial court acts correctly in granting a summary judgment when a premises owner establishes a statutory basis for non-liability and plaintiffs fail to prove that a material fact issue exists as to an exception, whether the trial court may have granted the motion on other grounds is moot. We overrule John Brocken's second issue, namely, that the trial court erred in granting summary judgment to Entergy.

## CONSORTIUM CLAIMS

■ The only claims asserted by America Brocken and Olga Martinez against Cooper and Entergy were for loss of consortium due to John Brocken's injury. When a loss of consortium claim is derived from the impaired spouse's injury, the claim is derivative of the impaired spouse's claim "to the extent that the tortfeasor's liability to the impaired spouse must be established." *Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex.1978). In response to Cooper's and Entergy's motions for summary judgment, America and Olga presented no additional summary

judgment proof beyond the proof presented for John. Under these circumstances, the trial court did not err in granting Cooper's and Entergy's summary judgment motions on their claims. *See Brewerton v. Dalrymple,* 997 S.W.2d 212, 217 (Tex.1999); *Motor Express, Inc. v. Rodriguez,* 925 S.W.2d 638, 640 (Tex.1996).

Accordingly, we overrule all of appellants' issues and affirm the trial court's judgment.

AFFIRMED.