In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-499 CV


____________________



JOHN BROCKEN, AMERICA BROCKEN, 


AND OLGA MARTINEZ, Appellants



V.



ENTERGY GULF STATES, INC. 


AND COOPER POWER SYSTEMS, INC., Appellees






On Appeal from the 136th District Court


Jefferson County, Texas


Trial Cause No. D-165,563






 OPINION 


 In this personal injury case, we must decide whether the trial court properly granted 
the defendants' motions for summary judgment. We affirm the summary judgment granted
to Cooper Power Systems, Inc., ("Cooper"), and hold that the plaintiffs failed to produce
evidence that Cooper breached any duty to provide warnings or instructions regarding
Cooper's product. Plaintiffs also failed to show that Entergy Gulf States, Inc., ("Entergy"),
the owner of the electric lines, had actual knowledge of the dangerous activity conducted on
its premises by North Houston Pole Line Corp., (NHP), an independent contractor. The trial
court's summary judgment granted to Entergy is also affirmed. 

THE CONSTRUCTION PROJECT

 On August 13, 2001, John Brocken suffered an injury during a construction project
that involved moving an energized distribution line from an old pole to a new pole. John was
part of a three-man crew employed by NHP. The crew also included Thomas Ferguson, the
job foreman, and Clayton Demouchette. All three NHP crew members were experienced
journeyman linemen. 

 Entergy hired NHP to install a new pole and move existing lines without interrupting
Entergy's electrical service to its customers. To execute the work, NHP provided a three-man crew, a digger truck to dig the hole for the new pole, and a bucket truck to lift two of
its employees to the distribution lines to move them. 

 NHP's safety manual requires its vehicles, including insulated buckets, to be grounded
while near contact distance of an energized electrical circuit. NHP's safety manual required
grounding the bucket truck with a five-foot screw-type ground rod; or, with a regular half-
inch ground rod; or, by connecting the ground wire from the bucket truck to the system
neutral. Apparently, the NHP crew followed none of these choices, and instead attached the
ground wire from the bucket truck to a copper wire on the new pole. 

 While the crew was moving an electric line to the new pole, a fault occurred. The
electricity flowed through the new pole, to the ground wire, to the bucket truck. The
electricity found a path to ground through the tires of the bucket truck. 

 Shortly after the fault, Demouchette suffered an electrical injury when he apparently
contacted the energized bucket truck. Brocken and Ferguson, who were in the bucket
approximately fifty feet in the air near the lines, lowered the bucket to the top of the cab of
the truck. While being lowered in the bucket, Ferguson saw the tires on the bucket truck
were on fire and noticed Demouchette lying by the front left tire of the truck. At that point,
Ferguson knew that "there was electricity running through the truck." Brocken fractured his
right ankle when he jumped from the top of the bucket truck to the ground. 

 The summary judgment evidence included the depositions of Ferguson and Brocken. 
Ferguson testified that Demouchette attached the ground wire from the bucket truck to a wire
that ran the length of the new pole. Ferguson testified that he did not consider the truck 
properly grounded. Brocken testified that he "would have either used a ground rod or a
screw ground." 

THE RECLOSER

 In 1982, Entergy's predecessor, Gulf States Utilities, purchased a "recloser," a device
that Cooper manufactured. In 1999, Entergy installed the recloser on the electric distribution
line in the vicinity of this project. A recloser is "a switch or circuit breaker that establishes
an electrical circuit again manually, remotely, or automatically after an interruption of
service." Webster's Third New International Dictionary 1896 (2002). A recloser
monitors the current, trips open at a preset threshold, and then recloses if the fault disappears. 
In this case, the recloser's settings allowed it to operate, or trip, if the amperage running
through the recloser reached 280 amperes. 

 Typically, the faults on electric distribution lines are caused by lightning strikes,
contact with tree limbs, or short circuits across phases of the lines. When a recloser opens,
it de-energizes the line; and, although the setting can be adjusted, a recloser typically stays
open about two seconds before reclosing. Thus, reclosers allow utilities to restore electric
power quickly by temporarily interrupting a line's electric current in response to occurrences
that would otherwise interfere with the utility's distribution of electricity to customers. 

 Cooper supplied Entergy with information regarding the amount of current and 
amperage required to trip Cooper's reclosers. The plate affixed to the recloser utilized here
indicates that Cooper rated it for 140 amps of continuous current. According to Bobby
Singletary, an Entergy witness and Entergy's area design manager, an Entergy engineer
specifies the reclosers placed on Entergy's electric lines and understands a recloser's basic
operations. Singletary testified that Entergy understood that the minimum trip setting on
Cooper's reclosers was two times the continuous current rating. The continuous current
rating on the recloser here was 140 amperes; and, it would trip at amperages of 280, or more. 
 Before beginning the transfer of the lines, Ferguson requested that Entergy place the
recloser in its "one shot" mode. Entergy's employee, James Murphy, changed the recloser
to its "one-shot" mode. When placed in this mode, the recloser in this particular case would
not automatically reset and would remain open after tripping in response to 280 amperes or
more of current. In the open position, electricity would not flow through the lines. The
recloser was approximately two miles from NHP's work site. Immediately after the accident,
Ferguson went from the work site to the recloser. As Ferguson prepared to trip the recloser
manually, he saw the switch move from the closed to the open position. 

 The Brockens agree that Entergy placed the recloser in the "one-shot" mode prior to
NHP's moving the lines to the new pole. After the accident, Entergy tested the recloser and
determined that it operated properly. The recloser did not open until the fault current reached
the recloser's trip threshold.

THE BROCKENS' CLAIMS AGAINST COOPER

 John Brocken, his wife, America, and his daughter, Olga Martinez, assert a marketing
defect claim against Cooper. The Brockens claim that Cooper marketed the recloser as a
safety device, but that the recloser had insufficient warnings. Specifically, the Brockens
assert that electrical workers such as John believe that reclosers will trip when a fault occurs
and, based on that belief, rely upon reclosers to de-energize a line immediately when a fault
occurs. 

 Cooper moved for a traditional summary judgment on the Brocken's marketing defect
claims, arguing in part that it had no duty to warn John because "a manufacturer has no duty
to warn of the dangers and risks associated with another's products." Cooper's motion for
summary judgment also asserts that "the lack of a warning was not a 'producing cause' of
this accident." In its brief, Cooper argues that users of reclosers are aware that reclosers do
not protect against the possibility that current may exist under some circumstances when an
electrical fault on a line occurs. Cooper contends that it has no duty to warn its users of
information about which they are already aware. Cooper further asserts that any alleged
failure to warn did not cause John's injury, because John knew the recloser did not trip, and
therefore chose to jump to avoid the possibility of being shocked. Finally, Cooper asserts
that there is no evidence that the recloser was unreasonably dangerous. 

THE BROCKENS' CLAIMS AGAINST ENTERGY


 As to Entergy, the Brockens asserted negligence and products liability theories in their
complaint. As a business invitee, the Brockens assert that Entergy failed to provide John
with a safe workplace. They also contend that Entergy negligently failed to warn John of a
dangerous condition on its premises. The Brockens claim that the dangerous condition is
Entergy's knowledge that linemen inappropriately rely on the use of reclosers placed in the
"one-shot" mode as safety devices. 

 In combined traditional and no-evidence motions, Entergy moved for summary
judgment on the Brockens' claims. Entergy's summary judgment is premised, in part, on its
contention that Chapter 95 of the Texas Civil Practice and Remedies Code creates limitations
on the liability of a premises owner to employees of independent contractors. Entergy
contends that it exercised no control over NHP's work, and had no actual knowledge of the
danger or condition that caused the accident. Entergy's motion also asserts that any
allegation it failed to warn NHP regarding characteristics associated with the recloser was
not a legal cause of John's injury. With respect to the Brocken's product liability claims,
Entergy asserts that electricity is not a product and that it is a user of the recloser, not its
manufacturer. 

TRIAL COURT RULES ON SUMMARY JUDGMENT MOTIONS

 On July 15, 2004, the trial court granted Cooper's motion for summary judgment and
did not explain the basis of its ruling. On the same date the trial court granted Entergy's
motion for summary judgment without explaining the basis for its ruling. 

 On appeal, the Brockens assert that their summary judgment evidence created issues
of material fact regarding whether Cooper marketed the recloser with insufficient warnings. 
With respect to Entergy, the Brockens assert that the existence of fact issues as to Entergy's
negligence in failing to warn linemen regarding the recloser's not protecting against certain
faults requires that we reverse the trial court's summary judgment. 

SUMMARY JUDGMENT EVIDENCE AND STANDARDS OF REVIEW

 If a trial court does not specify the grounds upon which it bases its summary
judgment, the appealing party must show that each independent ground alleged in the
respective defendant's motion for summary judgment is insufficient to support the trial
court's judgment. See FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872-73
(Tex. 2000); Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995). On appeal, the
reviewing court will affirm the summary judgment if any ground raised by the prevailing
party in its summary judgment motion has merit. Bradley v. State ex. rel. White, 990 S.W.2d
245, 247 (Tex. 1999); Star-Telegram, 915 S.W.2d at 473. 

 With respect to the sections of Entergy's and Cooper's motions that are traditional
motions for summary judgment under Rule 166a(c), "[s]ummary judgment is appropriate
only when there are no disputed issues of material fact and the moving party is entitled to
judgment as a matter of law." D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 2002). 
In reviewing the evidence presented, we "must resolve every doubt and indulge every
reasonable inference in the nonmovant's favor. All evidence favorable to the nonmovant will
be taken as true." Id. (citation omitted). The question on appeal is "whether the summary
judgment proof establishes as a matter of law that there is no genuine issue of fact as to one
or more of the essential elements of the plaintiff's cause of action." Gibbs v. General Motors
Corp., 450 S.W.2d 827, 828 (Tex. 1970); see Tex. R. Civ. P. 166a(c). We review the
decision of the trial court under a de novo standard. Natividad v. Alexsis, Inc., 875 S.W.2d
695, 699 (Tex. 1994). 

 With respect to those portions of Cooper's and Entergy's motions that constitute no
evidence motions under Rule 166a(i), we note that "[a] no-evidence summary judgment is
essentially a pre-trial directed verdict. . . ." King Ranch, Inc. v. Chapman, 118 S.W.3d 742,
750 (Tex. 2003). The nonmovant must produce more than a scintilla of evidence to defeat
a no-evidence motion. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). 
"[M]ore than a scintilla of evidence exists if the evidence rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions." Id. (citing Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); Burroughs Wellcome Co. v. Crye,
907 S.W.2d 497, 499 (Tex. 1995); Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.
1994)). We review a no-evidence summary judgment de novo by construing the record in
the light most favorable to the respondent and disregarding all contrary evidence and
inferences. Oliphint v. Richards, 167 S.W.3d 513, 515-16 (Tex. App.- Houston [14th Dist.]
2005, pet. denied); Reynosa v. Huff, 21 S.W.3d 510, 512 (Tex. App.- San Antonio 2000, no
pet.).

APPLICATION OF LAW TO FACTS REGARDING COOPER

 Before the hearing on the summary judgment motions, the Brockens waived their
complaints of manufacture and design defect against Cooper. The Brockens' remaining
assertion was a marketing defect claim. With respect to this claim, Cooper's motion for
summary judgment asserts that Cooper has no duty to warn that its recloser will not trip in
response to any surge in current. 

 Here, Cooper marketed a recloser to a utility that subsequently installed it in an
electrical distribution system. With respect to component-parts manufacturers, the Texas
Supreme Court distinguishes between duties owed to consumers and duties owed to
sophisticated users. The Texas Supreme Court states that "if the component-part
manufacturer does not participate in the integration of the component into the finished
product, it is not liable for defects in the final product if the component itself is not
defective." Bostrom Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681, 683 (Tex. 2004)
(citing Restatement (Third) of Torts: Products Liability § 5 (1998); Cimino v. Raymark
Indus., Inc., 151 F.3d 297, 334 (5th Cir. 1998)); see Toshiba Intern. Corp. v. Henry, 152
S.W.3d 774, 778 (Tex. App. - Texarkana 2004, no pet.); Bennett v. Span Indus., Inc., 628
S.W.2d 470, 473 (Tex. App. - Texarkana 1981, writ ref'd n.r.e.). With respect to marketing
defects, the Texas Supreme Court has stated: "When the foreseeable users of a product have
special training, a supplier has no duty to warn of risks that should be obvious to them, even
if persons without such training would not appreciate the risks." Humble Sand & Gravel,
Inc. v. Gomez, 146 S.W.3d 170, 183 (Tex. 2004).

 The Brockens do not allege that Cooper participated in the design of Entergy's 
electrical distribution lines. "It is not proper to extend the doctrine of strict liability to the
supplier of a component part used in a product according to the design of the product's
manufacturer when the injuries are caused by the design of the product itself, rather than by
a defect in the component." (1) Bostrom Seating, 140 S.W.3d at 683. 

 The summary judgment evidence showed that Entergy, not Cooper, specified the
recloser to be placed on the line. In this case, the recloser did not open and interrupt the
current because Entergy did not design the distribution system to shut down when certain
faults occurred. The presence of electricity in the line after a fault occurred is due to the
design of the distribution system, not a defect in the recloser. Undisputed evidence shows
that the recloser on the electric distribution line operated as designed. 

 Nevertheless, a component part could be defective by virtue of the manner in which
it is marketed to its users. Manufacturers of component parts are generally required to supply
reasonable instructions and warnings to their component-parts buyers regarding the risks
associated with the use of their products. Henry, 152 S.W.3d at 783; Restatement (Third)
of Torts: Products Liability § 2 (c) (1998). The duty is limited, however, and does not
require warning or instructing about every characteristic of a component's operation. The
Supreme Court has expressly recognized differences between the duties of equipment
manufacturers to end users and the duties of component-part manufacturers to their buyers
with respect to manufacturing and design defects, and we believe similar distinctions apply
regarding marketing defect claims. See Bostrom Seating, Inc., 140 S.W.3d at 683. The
Bostrom Court cited section 5 of the Restatement (Third) of Torts: Products Liability, with
approval. Id. Comment b of Section 5 describes the limitation on the component-parts
manufacturers' duty to warn as follows:

[W]hen a sophisticated buyer integrates a component into another product, the
component seller owes no duty to warn either the immediate buyer or ultimate
consumers of dangers arising because the component is unsuited for the special
purpose to which the buyer puts it. 


Restatement (Third) of Torts: Products Liability § 5, cmt. b (1998). Thus, if Entergy
inappropriately used the recloser to protect linemen against all faults, as alleged by the
Brockens, Cooper had no duty to warn Entergy that the recloser was inappropriate for this
special purpose. 

 In addition, a manufacturer has no duty to warn of a product's obvious risks. Humble
Sand & Gravel, 146 S.W.3d at 183; Sauder Custom Fabrication, Inc. v. Boyd, 967 S.W.2d
349, 351 (Tex. 1998) (per curiam). A risk can be obvious to those who have special training. 
Humble Sand & Gravel, 146 S.W.3d at 183. 

 The court determines as a matter of law whether the user appreciates an obvious risk,
unless the evidence raises fact issues that must be resolved. Id.; Caterpiller, Inc. v. Shears,
911 S.W.2d 379, 383 (Tex. 1995). No duty to warn exists where a user is already aware of
the risk or the risk is obvious. Boyd, 967 S.W.2d at 351; Shears, 911 S.W.2d at 383. 

 In this case, the evidence showed that the relevant Entergy personnel responsible for
designing the distribution system knew the recloser would not trip unless the fault created
280 amperes of current or more in the line. The summary judgment evidence showed that
Cooper provided information to its user, Entergy, regarding its reclosers so that users like
Entergy could select the operating characteristics it wanted with respect to the recloser's
interruption of electrical current. The summary judgment evidence is undisputed that
relevant Entergy employees used this information to decide the settings used on the reclosers
that Entergy placed in its distribution system. 

 Using a recloser set to open at a preset level necessarily creates a risk that it will not
open at levels below its setting. Electricity will obviously be present downstream of a
recloser if the contacts on the recloser are closed. Cooper's summary judgement evidence
shows that Entergy employees responsible for the design of the electric distribution system
appreciated the obvious risk that a recloser set to open at 280 amperes would not open at fault
currents of less than 280 amperes. 

In response to Cooper's evidence, the Brockens had to show that Cooper had a duty
to give adequate warnings about its product's dangers that it knew of or should have known
about, which failure rendered the recloser unreasonably dangerous as marketed. Bristol-Myers Co. v. Gonzales, 561 S.W.2d 801, 804 (Tex. 1978); Technical Chem. Co. v. Jacobs,
480 S.W.2d 602, 605 (Tex. 1972). The Brockens failed to show that Cooper, a component-part manufacturer, under these facts and circumstances, had a duty to warn Entergy of the
dangers of using a recloser for the special purpose that the Brockens assert Entergy used it. 
Cooper also established that Entergy was aware of the risk and that the risk is obvious to an
electric utility. Generally, a component-part manufacturer is not required to warn its users
of obvious risks or of characteristics already known by the user. The trial court did not err
in granting Cooper's traditional summary judgment on these grounds.

We need not address other arguments by the Brockens that their summary judgment
response raises material facts as to other essential elements of their case against Cooper. We
also do not address other arguments by Cooper that the trial court correctly granted its motion
for summary judgment. Because a trial court acts correctly in granting a summary judgment
when a defendant proves it had no duty to plaintiffs, or that it breached none of its duties,
whether the trial court erred or correctly granted the motion on other grounds is moot. We
overrule John Brocken's first issue - namely, that the trial court erred in granting summary
judgment to Cooper. APPLICATION OF LAW TO FACTS REGARDING ENTERGY

It is undisputed that Entergy owned the electric distribution lines involved in the suit
and that Brocken was an employee of a contractor that Entergy hired to construct, renovate,
or modify an improvement to real property. The Brockens do not contend that Chapter 95
of the Texas Civil Practice & Remedies Code is inapplicable to their claims against Entergy. 
Section 95.003 provides:

A property owner is not liable for personal injury, death, or property
damage to a contractor, subcontractor, or an employee of a contractor or
subcontractor who constructs, repairs, renovates, or modifies an improvement
to real property, including personal injury, death, or property damage arising
from the failure to provide a safe workplace unless:


 (1) the property owner exercises or retains some control over the
manner in which the work is performed, other than the right to order the work
to start or stop or to inspect progress or receive reports; and


 (2) the property owner had actual knowledge of the danger or
condition resulting in the personal injury, death, or property damage and failed
to adequately warn. 


Tex. Civ. Prac. & Rem. Code Ann.§ 95.003 (Vernon 2005). In its motion for summary judgment, Entergy asserted that there was no evidence that
it had actual knowledge of the danger resulting in Brocken's injury and cited Rule 166a(i)
as authority for judgment in its favor. Under Chapter 95, the premises owner must exercise
or retain control over the manner of the work, and have actual knowledge of the danger or
condition of the premises that causes the injury. Tex. Civ. Prac. & Rem. Code Ann. §
95.003 (1), (2). The Brockens assert that the danger on the premises consisted of Entergy's
knowledge that electrical line workers such as John Brocken falsely relied on reclosers set
in a "one-shot" mode to recognize a fault and de-energize the line. (2) John asserts that had he
known about the current interruption characteristics of the recloser, the NHP crew could have
taken precautions to ground its work differently. (3) 

 On appeal, the Brockens assert that Entergy knew that linemen relied on a recloser set
in "one-shot" mode to provide a safe working environment for workers in the proximity of
a fault. As evidence of Entergy's knowledge of the danger, the Brockens cite the deposition
testimony of NHP's foreman, Ferguson, who testified that the recloser was put in a "one-shot" mode "[s]o, if something does happen, the electricity will turn off and not come back
on." Ferguson also described his understanding of the recloser's operation when it was in
the "one-shot" mode: A one-shot means that the apparatus is set to activate one time. 
If electricity goes to ground, then it will trip the recloser and not
turn the electricity back on. When it's in a normal state, it will
operate at least three times. It will turn off, wait a couple of
seconds, turn back on. 


Demouchette had a similar understanding of a recloser's operation. In his deposition,
Demouchette testified that a "one-shot" meant "if something happens, yeah, the line just
shut[s] itself down." 

 The Brockens point us to portions of the sworn report of their expert, Judd Clayton,
an electrical engineer, for evidence they contend creates a fact issue regarding Entergy's
knowledge of the danger. Clayton's report states: 

 Both Entergy and North Houston Pole Line employees involved
in this incident were of the perception/expectation that a recloser
placed on "one-shot" would quickly de-energize the line and
thus, provide a safe working environment for those who happen
to be working in proximity of a fault of the nature of the one that
occurred. 

 

 Finally, the Brockens also point us to the testimony of two Entergy employees, James
Murphy and George Sanchez, included in the Brockens' summary judgment response. The
Brockens argue that the testimony of these employees shows that Entergy knew of the danger
that the Brockens complain of here. 

 The Brockens argue that the deposition testimony of James Murphy, the Entergy
employee who placed the recloser in the "one-shot" mode, is evidence that Entergy knew of
the danger. Murphy testified that the purpose of placing the recloser in the one-shot mode
was so that "if something goes wrong, it ensures that the line will not come back energized. 
If it sees a fault, it will trip out and stay out." With respect to George Sanchez, he testified
that he understood the one-shot setting on the recloser to offer "protection for us." Sanchez
was the Entergy employee who tested the recloser after the incident. 

 To meet Chapter 95's actual knowledge requirement with respect to a negligent
activity, the Brockens must show: (1) Entergy had actual knowledge that the crew
transferring the distribution lines had a false expectation that the recloser would open in
response to any fault on the electric line; (2) Entergy knew of the danger to NHP's crew
resulting from the crew's false expectation; and (3) the crew's working under the false
expectation proximately caused the accident. We do not agree that the summary judgment
evidence offered by the Brockens is evidence showing Entergy knew of NHP's crew's false
expectation regarding the recloser's operation, or that the Brockens showed Entergy knew
of the danger the false expectation created to the crew engaged in transferring its electric
lines.

 The depositions of Ferguson and Demouchette show, at most, that they were unaware
that the recloser required sufficient fault current to reach the recloser's trip threshold. The
testimony does not demonstrate that Entergy was actually aware of the crew's
misapprehension, and there is no testimony that prior to the incident the crew members
informed anyone at Entergy of their apparent incorrect understanding of the recloser's
operation. 

 Clayton's opinion that employees of Entergy "involved in this incident," and NHP's
crew, misunderstood the details of the recloser's operation does not create a fact issue as to
Entergy's knowledge of the NHP's crew misapprehension regarding the recloser's operation.
Clayton did not express the opinion that Entergy was actually aware that NHP's employees
misunderstood the recloser's operation prior to the incident. Clayton's report cannot fairly
be interpreted to infer that Entergy knew that NHP's employees were working on the electric
line under the misapprehension that the recloser would protect them from any fault, however
small. 

 The testimony of Entergy's employees, Murphy and Sanchez, also does not support
any inference that Entergy possessed actual knowledge of the danger about which the
Brockens complain. Murphy was not questioned in his deposition about whether the recloser
would trip in response to any fault on the line. If it can be inferred from Murphy's general
testimony that he thought the recloser would open in response to any fault, the inference is
that he misunderstood the characteristics of the recloser's operation. Whether Murphy
understood or misunderstood the actual characteristics of the recloser, his testimony does not
address his knowledge of NHP's employees' assumptions regarding the recloser's operating
characteristics. There is also no testimony that Murphy had any contact with the NHP crew
prior to the incident. 

 Sanchez's testimony shows that he tested the recloser after the accident. There is no
testimony that he had any involvement in the work of NHP to transfer the lines before the
incident or that he even knew of the project prior to Brocken's injury. Sanchez did not
address what he knew of NHP's crew's knowledge of the recloser's operation. Sanchez's
testimony that he understood the recloser to offer protection does not show or tend to
establish that he knew the NHP crew was operating under a false belief regarding the
recloser's operating characteristics before the accident. 

 Entergy's motion for summary judgment established that chapter 95 applies to the
Brockens' claims. Once Entergy established that it was a premises owner and hired an
independent contractor, the Brockens had the burden to present controverting evidence. To
properly respond to Entergy's no evidence motion, the Brockens were required to produce
evidence establishing an exception to chapter 95. See Tex. Civ. Prac. & Rem. Code Ann.
§ 95.003; Phillips v. Dow Chemical Co., 186 S.W.3d 121, 133 (Tex. App. - Houston [1st
Dist.], no pet.); Rueda, 178 S.W.3d at 111.

 We hold that the Brockens presented no summary judgment evidence concerning
Entergy's actual awareness of the danger that the Brockens contend arose out of NHP's
activity in moving the electric lines. The trial court correctly granted Entergy's no evidence 
motion for summary judgment based on Chapter 95 of the Texas Civil Practice & Remedies
Code.

 We need not address other arguments by the Brockens that their summary judgment
response raises material facts as to other essential elements of their case. We need not
address Entergy's other arguments regarding whether it had control or the right to control
NHP's work, or regarding causation. Because a trial court acts correctly in granting a
summary judgment when a premises owner establishes a statutory basis for non-liability and
plaintiffs fail to prove that a material fact issue exists as to an exception, whether the trial
court may have granted the motion on other grounds is moot. We overrule John Brocken's
second issue, namely, that the trial court erred in granting summary judgment to Entergy. CONSORTIUM CLAIMS 

 The only claims asserted by America Brocken and Olga Martinez against Cooper and
Entergy were for loss of consortium due to John Brocken's injury. When a loss of
consortium claim is derived from the impaired spouse's injury, the claim is derivative of the
impaired spouse's claim "to the extent that the tortfeasor's liability to the impaired spouse
must be established." Whittlesey v. Miller, 572 S.W.2d 665, 667 (Tex. 1978). In response
to Cooper's and Entergy's motions for summary judgment, America and Olga presented no
additional summary judgment proof beyond the proof presented for John. Under these
circumstances, the trial court did not err in granting Cooper's and Entergy's summary
judgment motions on their claims. See Brewerton v. Dalrymple, 997 S.W.2d 212, 217 (Tex.
1999); Motor Express, Inc. v. Rodriguez, 925 S.W.2d 638, 640 (Tex. 1996). 

 Accordingly, we overrule all of appellants' issues and affirm the trial court's
judgment. 

 AFFIRMED.

 ____________________________

 HOLLIS HORTON

 Justice



Submitted on May 25, 2006

Opinion Delivered July 13, 2006

Before Gaultney, Kreger, and Horton, JJ.
1. Because we dispose of the case on other issues, we do not reach the question of
whether the alleged marketing defect caused John's injury.
2. We do not reach the issue of whether Chapter 95 encompasses dangers that arise from 
negligently conducted activities as contrasted with claims for premises defects, as it is not
one of the bases for Entergy's motion for summary judgment and is not argued by the parties
on appeal. See Rueda v. Paschal, 178 S.W.3d 107, 110 (Tex. App. - Houston [1st Dist.]
2005, no pet.) (interpreting "danger" and "condition" as synonymous, and stating that the
presence of a ladder was not a premises condition). We express no opinion regarding
whether the legislature intended to use "danger" and "condition" as synonyms in Section
95.003(2). Tex. Civ. Prac. & Rem. Code Ann. § 95.003(2). If Chapter 95's exceptions
allow an independent contractor's injured employee's claim because the owner is aware that
the contractor's activity presents the contractor's employee with a danger, which both parties
have assumed, the actual knowledge requirement of Chapter 95 remains a necessary element
of establishing a claim against a premises owner under Chapter 95.
3. Entergy also argued that any alleged deficiency in warning did not proximately cause
the accident. We do not reach the issue because it is not necessary to the resolution of the
appeal, but note that NHP, Brocken's employer, provided grounding instructions that were
not followed.