**TOSHIBA INTERNATIONAL CORPORATION,**
**Appellant,**

v.

**Shannon HENRY and Teresa Henry, Appellees.**

**No. 06–04–00002–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Oct. 27, 2004.

Decided Dec. 9, 2004.

Rehearing Overruled Jan. 19, 2005.

Jeffrey C. Lewis, Atchley, Russell, Waldrop & Hlavinka, LLP, Texarkana, for appellant.

W. David Carter, John R. Mercy, Mercy, Carter, Tidwell, LLP, Texarkana, for appellees.

Before ROSS, CARTER, and CORNELIUS,* JJ.

## OPINION

Opinion by Justice CARTER.

This case has one primary issue: Did the manufacturer of a nondefective component part substantially participate in the integration of that part into a system that was found to be defective.

Shannon Henry sued Toshiba International Corporation on products liability and negligence theories to recover damages for personal injuries sustained on the job at Alcoa, an aluminum industrial facility. Teresa Henry (Teresa), Henry's wife, also sued Toshiba alleging a derivative loss of consortium claim. Toshiba manufactured and sold to Alcoa an inverter or controller that Alcoa integrated into a larger system. The inverter itself functioned as it was designed. The jury found for the Henrys on all liability theories and awarded damages totaling $430,610.00.

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment.

## Facts

Henry worked for Alcoa, which processes raw aluminum into roll form and then paints it. The process produces scrap aluminum that is recycled onto a "scrap winder." The scrap aluminum is taped onto the scrap winder, which is powered by an electrical system. Alcoa designed and assembled a control panel and wired it to the Toshiba inverter, which regulates the power to the scrap winder. The inverter receives electrical commands from the switches on the control panel, converts the current from alternating to direct current and then back to alternating current at variable frequencies and ultimately delivers the electricity at the proper frequency to the motor of the scrap winder to control the speed at which the winder operates. Although Toshiba manufactured the inverter, it did not design or install the control panel, wiring, or switches attached thereto. Toshiba did not make or send the control panel to Alcoa or produce the switch on the panel.[1] Toshiba did provide a detailed manual for use in the installation of the inverter. Either Alcoa or a contractor actually designed and installed the control panel, switches, and wiring to the inverter. The inverter responded to the signals it received in the way it was designed. The inverter is designed for many different types of applications in industrial settings where regulation of the speed of a moving part is required.

The inverter was designed to allow two speed modes. The "run" mode would allow the motor being controlled to run at the speed set or programmed. It would also run at a slow or "jog" speed. Alcoa's control panel was designed so that both the jog and run speeds were connected to the inverter by the operation of one

1. The switch was apparently manufactured by the Square D Corporation.

switch. When the switch on the control panel was closed, the slow speed information was relayed to the inverter, whereas the open switch sent the information to the inverter for a fast speed. The alleged defect in the system was that, as it was configured, when an operator would request a slow speed by engaging the jog button, if a switch on the control panel was not operating properly, the switch would not close or connect and therefore improper information was sent to the inverter that a fast speed was needed. In turn, the inverter delivered the frequency to the motor, which started the motor in a fast speed when the operator was expecting a slow speed. In essence, it is alleged that the external switch gave the inverter the wrong signal.

Toshiba included a detailed manual to accompany the inverter, providing instructions and schematics to system designers and installation personnel. The inverter contained a light-emitting diode (LED) display and an operating panel with user buttons and multifunctional keys for data entry. The LED will display "I-04" or "I-00" to indicate to the operator whether the mode is jog or run, respectively, before pushing the start button.

On multiple occasions (ten to twelve times) before Henry's accident, the scrap winder started at a faster speed when the operator selected the jog speed. There was no predictability or pattern to these malfunctions. The Alcoa electricians could not duplicate the malfunction.

On September 14, 1998, Henry was running the paint line at Alcoa. The paint line was shut down for a paint change. Henry went to the scrap winder to begin the process of recycling the scrap aluminum. He picked up the aluminum and taped it to the scrap winder using nylon tape. The aluminum gauge was heavy; Henry requested David Turney's help.

Henry asked Turney to start the winder on the jog mode. Turney saw the switch was on the jog mode; he then waited for Henry's signal and pushed the start button. The winder started spinning at fast speed. Henry was startled and backed away, and his pants were caught in hydraulic lines. He fell on his back and was injured.

### Analysis

■ The four elements for a strict liability action are: (a) the product must be defective; (b) the product must reach the consumer without substantial change from the time it leaves the possession and control of the manufacturer or seller; (c) the defective condition of the product must render the product unreasonably dangerous; and (d) the unreasonably dangerous condition of the product must be the cause of the injury to the user. RESTATEMENT (SECOND) OF TORTS § 402A (1965); see *Houston Lighting & Power Co. v. Reynolds,* 765 S.W.2d 784 (Tex.1988); *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–89 (Tex.1967).

■ The manufacturer has a duty to prevent a defective product that is unreasonably dangerous from reaching a consumer and causing injury. A product may be defective as a manufacturing defect, design defect, or marketing defect. *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995). Conversely, a manufacturer has no duty to protect a consumer from a nondefective product. In order for a component part manufacturer to be responsible for the integration of its product into a larger system, which is found to be defective, it must have substantially participated in the integration of the component into the final product. Otherwise, the component manufacturer has no duty independent of the completed product assembler to analyze the completed product which

incorporates its nondefective component part. *See Davis v. Dresser Indus., Inc.*, 800 S.W.2d 369, 371 (Tex.App.—Eastland 1990, writ denied).

**Does the component parts doctrine apply?**

1. Design defect

■ Over twenty years ago, this Court held that a manufacturer of a component part that was not defective itself should not be held strictly liable when the component part is integrated into a product alleged to be defective. If the component part manufacturer does not take part in the design or assembly of the final system or product, it is not liable for defects in the final product if the component part itself is not defective. *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 473 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.); *see Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 716 (5th Cir.1986). This rationale is now expressed in the Restatement of Torts, which has recently been cited favorably by the Texas Supreme Court. *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681 (Tex.2004). The Restatement states:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b) (1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
>
> (2) the integration of the component causes the product to be defective, as defined by this Chapter; and

> (3) the defect in the product causes the harm.

Restatement (Third) of Torts § 5 (1998).

In *Bostrom,* a garbage truck driver sued the truck manufacturer, Crane Carrier, for personal injuries sustained in a rollover accident. *Bostrom,* 140 S.W.3d at 682. Crane brought a third-party action against Bostrom Seating, the manufacturer of the driver's seat used in the truck. *Id.*

The court held that it was not proper to extend the doctrine of strict liability to the supplier of a component part used in a product according to the design of the product's manufacturer when the injuries are caused by the design of the product itself, rather than by a defect in the component. *Id.* Thus, the issue was whether the evidence presented during trial demonstrated that the seat supplied by Bostrom to Crane was itself defective. *Id.* The Court found that Crane designed the garbage truck and chose which seat it would use. *Id.* The evidence did not prove that the Bostrom seat, in and of itself, was defective. *Id.* at 684. "At best, the evidence supports a possible conclusion that using the seat in this specific truck created an allegedly defective restraint system design. Crane was in total control of the design of that system, and Bostrom, playing no part in the design of the truck, cannot be held liable for its possible defectiveness." *Id.* at 684–85.

Likewise, here it is clear that the inverter Toshiba manufactured and sold to Alcoa did not contain a manufacturing defect. The alleged defect is as a result of the integration of the inverter into the Alcoa scrap winding system. Accordingly, Toshiba can be held liable for a design or marketing defect only if it "substantially participated" in the integration of the inverter into the design of the scrap winder system.

Dr. William Gosney, Jr., appellees' expert, summarized the alleged design defect as follows:

The Toshiba controller responds to a number of switches on the panel.... One switch, or one button is the start button, one button is the stop button, and there is a two-position switch that determines whether ... it's going to be fast or slow. Those are the critical issues. If the switch that controls the speed is in the fast mode, then internally the switch does not make a connection. The controller responds to that lack of connection in such a way that when the run button is pushed the motor starts fast. If, however, the operator desires the motor to run slow, in the jog speed, the operator turns the switch to the right to the jog mode position. Internally, that causes connections within the switch to be made. The Toshiba controller will respond to that connection. It then knows internally that it's going to be slow when the start button is pushed. When the start mode button is pushed it would then start slow. The problem that can occur is if the operator turns the switch to the slow speed, but for some reason, age, corrosion, what have you, the switch internally does not connect. The operator then expects the unit to start slow. The controller, however, has not received the electrical signal from those switches that would signify that it's going to start slow. Therefore, when the start button is pushed, it starts fast.

The Henrys argue that, even though Toshiba did not design, manufacture, or install the scrap winder system including switches and the control panel, it did substantially participate in the integration of the component (the inverter) into the system by supplying to Alcoa a manual consisting of forty-six pages, a part of which showed how to install this inverter or how it should be wired. It also gave an 800 number to call for questions. The Henrys allege this is sufficient participation by Toshiba to make Toshiba responsible for the defect in the integrated product. We have not been cited to any authority, nor have we found any, holding that supplying an instructional manual with a product is sufficient participation in the integration of the component into the final product to subject the party to liability. The Henrys argue that the manual contains installation instructions and that Alcoa followed the manual in the installation of the system. Gosney's testimony is inconsistent on this issue. On direct examination, Gosney stated the "control panel which is built in accordance with the instructions in the Toshiba application and user's guide manual...." However, on cross-examination, when asked where the manual states how to construct the switch panel, he answered, "There are schematics given in terms of application notes of how one connects various terminals in the Toshiba, if you want to call it drive, or controller, the various switches that one would use in the panel." Gosney further acknowledged, "It doesn't specifically say how to design a switch panel. What it shows is how to connect the switches to make it do what you want it to do." He further agreed the control panel could have been assembled in such a way as to avoid this accident.

Mark Rainer, Toshiba's expert, stated Alcoa omitted an important safety feature in the design and installation of the system. Rainer stated that, "They used some information out of the manual, but I would say it's not wired in accordance with the way we had intended for the drive to be." He further explained that, by adding a switch on the panel, there could have been a fail-safe system and if the jog switch had failed, the whole thing would just stop. Rainer testified that the manual clearly

shows that a switch can be added and this problem avoided; further it shows that the switch box could have been arranged in a fashion so that, if the jog switch did fail, there would still not have been an automatic run command. Further, Rainer said, "The way they designed the panel you can't turn the drive off. You're either commanding a forward or a run—or reverse rather."

Rainer further testified:

Q And that's a—am I correct in assuming that's a result of the way they designed the panel and not the way that the inverter itself is put together?

A Yes.

Q Alright.

A Now I want to be clear that it worked that way, but it wasn't really the way that it was intended to be wired.

It is undisputed that Toshiba did not actually participate in the integration process and had no control concerning any decision made by Alcoa in the ultimate incorporation of the inverter into the overall control panel or scrap winding system. The Henrys argue that one of Toshiba's witnesses, Steve Unger, admitted that the inverter was installed properly. However, it is clear that Unger's testimony did not involve the control panel and switches, but referred to the internal wiring of the drive.

The facts of *Bostrom* are analogous to the facts of the present case. As in *Bostrom*, Alcoa designed the scrap winder system, including the control panel, chose the inverter and wired it, and placed the switches on the control panel. Gosney testified that a switch failure would allow the inverter to operate at a faster speed instead of the slower speed and that this resulted in the defect. He testified there were safer alternatives that could have been implemented to prevent the kind of injury sustained by Henry. However, this evidence relates to the defectiveness of the scrap winder and control panel design, not to the specific inverter in question. At best, the evidence supports a possible conclusion that using the inverter in this specific scrap winder created an allegedly defective scrap winder system.

The Restatement of Torts gives illustrations of actions taken by a component seller that constitute substantial participation in the integration of the component into the design of another product: (1) the manufacturer or assembler of the integrated product may invite the component seller to design a component that will perform specifically as part of an integrated product, or (2) to assist in modifying the design of the integrated product to accept the seller's component, or (3) play a substantial role in deciding which component best serves the requirement of the integrated product.

However, the Restatement further states that providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability. RESTATEMENT (THIRD) OF TORTS § 5 cmt. e.

Here, there is no evidence that Toshiba was invited by Alcoa to design the component specifically as a part of the integrated product or to assist in modifying the design of the integrated product to accept the seller's component or to decide which component best served Alcoa's requirement. Alcoa was in total control of the design of that system. Alcoa chose the method of wiring to connect the inverter and the control panel, and chose the arrangement of switches on the control panel. Toshiba played no part in the design of the scrap winder and the control panel.

The evidence showed that Toshiba's inverter is used in many different ways depending on the requirements of the user.

It is primarily meant for industrial purposes and could be used to control the speed of a fan, conveyor, water pump, or rock crusher. Any kind of motion-driven device lends itself well to such a drive in industrial applications.

A component seller, however, is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. RESTATEMENT (THIRD) OF TORTS § 5. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation.[2] *Id.* Several cases illustrate this point. In *Welsh v. Bowling Elec. Mach.*, 875 S.W.2d 569 (Mo.Ct.App.1994), a plaintiff was injured when a tram conveying passengers improperly accelerated, causing the plaintiff to be thrown in a lake. The tram was built by Havener. Havener had purchased some of the component parts, including an electrical control box, electromagnetic brake, gearbox, and a wiring diagram from Bowling Electric, the defendant. There was no contention that any of the components supplied by Bowling Electric failed to function properly. The plaintiff's theory was that Bowling Electric failed to design and include an independent safety mechanism in its component parts. The essence of the plaintiff's complaint was that Bowling failed to design or furnish parts that would safeguard against a danger created by Havener's faulty design and construction of the other portions of the tram.

The court held Bowling had no duty to design or furnish those additional features.

Havener did not invite or desire that Bowling participate in the design of the remaining portions of the tram. There was no evidence that Bowling was furnished with plans, design, or information concerning the manner in which the remaining portion of the tram would be constructed. The court found that Bowling had no duty to design or furnish those additional features.

In *Smith v. Aqua–Flo, Inc.*, 23 S.W.3d 473 (Tex.App.—Houston [1st Dist.] 2000, pet. denied), a small child drowned in a spa when her hair became entangled in the intake covers. Aqua–Flo sold the pump for the spa. There was nothing defective about the pump itself. The Aqua–Flo pump was installed by an unrelated third party. The spa manufacturer had affixed the pump to the connecting pipes, spa inlet, and outlet openings. The plaintiff maintained that an unreasonably dangerous condition arose because the spa pump was connected to small pipes that were connected to a small inlet and outlet opening without the proper antientanglement covers. The court found that the complaint concerned the plumbing and parts related to the spa, not the pump. The component part manufacturer did not design or assemble the final product and was not liable for defects since the component was not defective. *Id.* (citing *Davis v. Dresser Indus., Inc.*, 800 S.W.2d 369, 370 (Tex.App.—Eastland 1990, writ denied); *Bennett*, 628 S.W.2d at 472–73).

■ Toshiba's product operated as it was designed. The product was not defectively manufactured. The design and installation of the control panel, switches,

---

**2.** Some commentators have suggested that the crucial issue is "whether the component ... presents a danger that accompanies most or all end uses. If the component has no general use danger because it is suitable for many end-products in which the danger does not arise, then the safe use of the component ... in the finished product becomes the finished product manufacturer's responsibility." Edward M. Mansfield, *Reflections on Current Limits on Component and Raw Material Supplier Liability and the Proposed Third Restatement*, 84 KY. L.J. 221, 228 (1995).

and wiring of the system was done by Alcoa or its contractors, over which Toshiba had no control. We hold that, as a matter of law, Toshiba's providing this generic installation manual for a product that could be used in many applications was not sufficient participation by the component manufacturer to impose liability for a defect in the integrated system. Toshiba had no duty to the Henrys because it did not participate in the integration of its component part into the scrap winder system.

### 2. Marketing defect

■ A manufacturer of a component part is required to supply reasonable instructions and warnings to the component buyer regarding the risks associated with the use of the component product. Toshiba did provide a manual that described many hazards and contained many warnings of the general dangers attendant to the use of the inverter. The Henrys argue that Toshiba should have specifically warned Alcoa of the danger of wiring the jog and fast speed using only one switch.

■ The same principles apply in determining a component seller's duty to supply reasonable instructions and warning to the component buyer. The component seller is required to provide instructions and warnings regarding risks associated with the use of the component product. *See* RESTATEMENT (THIRD) OF TORTS § 2(c) (1998). However,

> when a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it.

RESTATEMENT (THIRD) OF TORTS § 5 cmt. a, illus. 1. To impose a duty to warn in such a circumstance would require that compo-

nent sellers actively participate in the integration process. RESTATEMENT (THIRD) OF TORTS § 5.

The Restatement summarizes the component seller's duties:

> The case law imposing a duty to warn immediate buyers of general dangers attendant to use of a raw material or component is clear. Sellers of components and raw materials have a duty to provide reasonable warnings. *See, e.g., Hill v. Wilmington Chem. Corp.,* 279 Minn. 336, 156 N.W.2d 898, 902 (1968). The issue is whether the seller of a component or raw material has a duty to inform itself about the specific applications of its component and a further duty to determine whether the buyer who will integrate it into another product is knowledgeable as to the dangers attendant to that specific application. No cases have been found imposing such an onerous duty. Indeed, the entire thrust of the case law is that when the product component is not defective in itself, liability only arises when the component seller substantially participates in the design of the final integrated product.

RESTATEMENT (THIRD) OF TORTS § 5 cmt. a, illus.6; *see Crossfield v. Quality Control Equip. Co., Inc.,* 1 F.3d 701, 705 (8th Cir. 1993) (no duty to warn by a manufacturer of a nondefective chain which was integrated into a greater machine system that contained a design defect when the integrated machine was designed and assembled by someone other than the component part supplier); *Beneway v. Superwinch, Inc.,* 216 F.Supp.2d 24, 28 (N.D.N.Y.2002) (manufacturer of hook supplied with winch had no duty to warn ultimate user of dangers of using hook in conjunction with overhead lifting); *Shanks v. A.F.E. Indus., Inc.,* 275 Ind. 241, 416 N.E.2d 833, 837–38 (1981) (man-

ufacturer of a grain dryer that was incorporated into a new grain elevator complex was not liable for failure to warn because the owner of the grain elevator was not ignorant of any of the facts concerning the operations and dangers inherent in the function of the dryer and because the defendant had no way of knowing exactly how the dryer would be employed in the grain elevator complex); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267, 272 (1977) (plaintiff was injured when some extrusion fell onto the operating buttons of a punch press, causing it to operate; component part manufacturer of the operating buttons was not liable in strict liability for failure to warn because "the obligation that generates the duty to warn does not extend to the speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependent upon the nature of their integration into a unit designed and assembled by another"); *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 523 Pa. 1, 564 A.2d 1244, 1247 (1989) (manufacturer of electrical control system for hydraulic loader had no control over or knowledge of placement of switch near maintenance stops, and, as such, could not be strictly liable).

■ As stated above, Toshiba only provided a manual to install the inverter. Toshiba neither participated in the integration of nor monitored the development of the systems into which the component was integrated. The Restatement states "providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability." RESTATEMENT (THIRD) OF TORTS § 5 cmt. a, illus. 5(e). Hence, Toshiba, as a component seller, did not have a duty to warn of the potential dangerous condition dependent on the nature of integration into a system designed and assembled by another.

### Negligence

■ The last issue concerns negligence. A manufacturer owes a duty of reasonable care to users of the products and must exercise care to discover dangerous propensities of the products. In other words, a manufacturer shall be held liable if it negligently manufactures a product that, unless carefully designed and manufactured, involves an unreasonable risk of causing harm. *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex.1978); *Otis Elevator Co. v. Wood*, 436 S.W.2d 324 (Tex.1968). Negligence in the product liability context focuses on the acts of the manufacturer to determine if those persons exercised ordinary care in the design, production, and sale of a product.

■ Several courts have held that, although a negligence claim requires a different showing from the strict liability claim, it is not logical for a manufacturer to be held liable for failing to exercise ordinary care when producing a product that is not defective because (1) if the product is not unreasonably dangerous because of the way it was manufactured, it was not negligent to manufacture it that way, and (2) even if the manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product unreasonably dangerous. *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir.1988). This assumes there is no other potentially negligent conduct in such case. When a plaintiff seeks recovery because of negligence or a theory of strict liability in tort, the burden is on the plaintiff to prove that the

injury resulted from a defect in the product. *Simms v. Southwest Tex. Methodist Hosp.*, 535 S.W.2d 192, 197 (Tex.Civ. App.—San Antonio 1976, writ ref'd n.r.e.).[3]

■ Here, the product was not manufactured defectively. Gosney, the Henrys' expert, testified the inverter responded to the signals it received in the way it was designed to respond. The Henrys' counsel in his oral argument also stated that the defect of which the Henrys complain is "a design of the system" and acknowledged that the inverter itself was not defective.

We have held that, since the inverter was a component of a larger system of which Toshiba had no participation in the design, Henry's injuries were not the result of a design defect or a marketing defect for which Toshiba is responsible. Before a negligence theory can be utilized in a products liability case, there must be proof of a defect in the product. Because there is no defect for which Toshiba is responsible, it necessarily follows that the negligence theory cannot be upheld.

### Loss of Consortium

■ A loss of consortium claim is derivative. *See Motor Express, Inc. v. Rodriguez*, 925 S.W.2d 638, 640 (Tex.1996). Loss of consortium damages are recoverable only when the nonderivative claim results in physical injury. *Id.* Since we have sustained Toshiba's contention that there is no defect for which Toshiba is responsible, the consortium claim also is reversed.

---

**3.** *See Sexton ex rel. Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 335 (4th Cir.1991) (deciding that any design defect claim, whether based on negligent breach of duty of care or on strict liability, is dependent on proof of defect); ... *Sprankle v. Bower Ammonia & Chem. Co.*, 824 F.2d 409, 413–14 (5th Cir. 1987) (applying Mississippi law in stating that negligence and strict liability theories "each present the essential question whether an inadequate warning caused the plaintiff's injuries"); *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir.1986) ("Most Circuits have ... held that there is no practical difference between strict liability and negligence in defective design cases...."); *Birchfield v. Int'l Harvester Co.*, 726 F.2d 1131, 1139 (6th Cir. 1984) ("In a defective design case ... the test for an 'unreasonably dangerous' condition is equivalent to a negligence standard of reasonableness...."); *Werner v. Upjohn Co.*, 628 F.2d 848, 857 (4th Cir.1980) (stating that distinction between strict liability and negligence should not produce different outcome in failure-to-warn cases); *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 968 (4th Cir.1971) (recognizing that standard of safety imposed on seller or manufacturer is essentially same whether theory is labeled negligence, strict liability, or warranty); *Ake v. Gen. Motors Corp.*, 942 F.Supp. 869, 874 (W.D.N.Y.1996) ("In a design defect case the two theories of liability [strict liability and negligence] are virtually identical."); *Mather v. Caterpillar Tractor Corp.*, 23 Ariz.App. 409, 533 P.2d 717, 719 (1975) (upholding ruling that withheld negligence count from jury on grounds that it would be "superfluous" and confusing if included with strict liability count); *Lambert v. Gen. Motors*, 67 Cal.App.4th 1179, 79 Cal. Rptr.2d 657, 660 (1998) ("Where liability depends on the proof of a design defect, no practical difference exists between negligence and strict liability...."); *Ogletree v. Navistar Int'l Transp. Corp.*, 269 Ga. 443, 500 S.E.2d 570, 572 (1998) ("The distinction between negligence and strict liability is not significant for the purposes of the risk-utility analysis."), *rev'd*, 271 Ga. 644, 522 S.E.2d 467 (1999); *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69–70 (Ky.1973) ("The distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned."); *Lecy v. Bayliner Marine Corp.*, 94 Wash.App. 949, 973 P.2d 1110, 1111 (1999) (seeing no practical difference between strict liability and negligence under facts of case and holding that finding of reasonably safe design in strict liability claim precludes finding of negligent design in negligence claim).

Richard L. Cupp, Jr. & Danielle Polage, *The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis*, 77 N.Y.U.L.Rev. 874, 883 n. 35 (2002); *see also Ford Motor Co. v. Miles*, 141 S.W.3d 309 (Tex.App.—Dallas 2004, no pet. h.).

### Conclusion

The issue addressed in the opinion is dispositive; therefore, we do not address the other points presented by Toshiba. We reverse the judgment of the trial court and render judgment in favor of Toshiba.