Affirmed
and Memorandum Opinion filed September 10, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00158-CV

____________

 

SICO NORTH AMERICA, INC., Appellant

 

V.

 

JAMES R. WILLIS, INDIVIDUALLY AND
AS NEXT FRIEND OF JOHN WILLIS, Appellee

 



 

On Appeal from the 334th
District Court

Harris County, Texas

Trial Court Cause No. 2005-25548

 



 

M E M O R A N D U M   O P I N I O N

In this products liability action, Sico
America, Inc.[1]
appeals a judgment entered on a jury verdict in favor of James R. Willis,
individually and as next friend of John Willis.  In two issues, Sico challenges
(1) the district court=s decision to apply Minnesota law instead
of the Texas statute of repose; and (2) the legal sufficiency of the evidence
to support the jury=s negligence finding.  We affirm.








Background

This products liability case involves a wheeled folding table
used at a school.  The table is a APacer@ model manufactured in 1985 by Sico,
a Minnesota corporation with its principal place of business in Minnesota. 
Humble Independent School District purchased the Pacer table from an equipment
dealer in 1986.

The Pacer table is designed to be moved on
wheels in a folded upright position.  When unfolded, two hinged halves fit
tightly together to form a six-foot-long rectangular table.  The table features
a lock bar; when engaged, the lock bar is supposed to catch as the table
unfolds and keep the halves upright in a tee-pee position.

On May 2, 2003, a Deerwood Elementary School teacher asked
11-year-old John Willis and another student to move the Pacer table to a
storage room.  As Willis pushed the table in a folded upright position through
the storage room door, the table began opening and pinched Willis=s right ring finger between the two
halves.  The lock bar did not catch, which allowed the table to slide rapidly
all the way down to the fully open position.  A portion of Willis=s finger was amputated when the two
table halves closed on it.

John Willis=s father sued Sico in Texas district court in 2005 and
asserted multiple claims in connection with John=s injury.  Suing individually and as
John=s next friend, John=s father alleged claims for design
defect, marketing defect, and negligence.  Sico designated Humble Independent
School District as a responsible third party.

Sico filed a motion for summary judgment asserting that
Willis=s suit is barred by the Texas statute
of repose.  See Tex. Civ. Prac. & Rem. Code Ann. ' 16.012 (Vernon Supp. 2008).  The
parties agree that Willis=s claims are foreclosed if the Texas statute of repose
applies because suit was filed more than 15 years after the table was sold.  See
id.[2]








Willis asserted that Minnesota law should apply because the
table was designed, manufactured, and marketed there.  Minnesota has no statute
of repose; instead, it has a Auseful life@ statute.  See Minn. Stat. ' 604.03(1) (2008) (AIn any action for the recovery of
damages for personal injury, death or property damage arising out of the
manufacture, sale, use or consumption of a product, it is a defense to a claim
against a designer, manufacturer, distributor or seller of the product or a
part thereof, that the injury was sustained following the expiration of the
ordinary useful life of the product.@).

The district court denied Sico=s motion for summary judgment.  Sico
re-urged its request to apply the Texas statute of repose shortly before
trial.  The district court again denied Sico=s request, holding that Minnesota=s useful life statute applied.








After a three-day trial, the jury answered Ano@ to questions asking whether there
was a design defect in the table or a defect in Sico=s marketing that was a producing
cause of Willis=s injury.  The jury answered Ayes@ to a question asking whether
negligent conduct by Sico and Humble Independent School District proximately
caused Willis=s injury, and awarded damages of $10,000 for past pain and anguish;
$30,000 for future pain and anguish; $2,000 for past disfigurement; $7,500 for
future disfigurement; $5,000 for past physical impairment; and $12,000 for
future physical impairment.  The jury attributed 60 percent of the
injury-causing conduct to Sico and 40 percent to Humble Independent School
District.  The jury also answered Ano@ to a question asking if the Pacer
table had exceeded its Auseful life@ when Willis=s injury occurred.[3]  The district
court signed a final judgment in conformity with the jury=s verdict.

Sico raises two issues on appeal.  First, it asserts that the
district court erred in failing to apply the Texas statute of repose to Willis=s claims.  Second, Sico argues that
there was no evidence to support the jury=s Ayes@ answer as to Sico=s negligence.

Analysis

I.         Choice
of Law

Determining which state=s law governs is a question of law
for the court to decide.  Torrington Co. v. Stutzman, 46 S.W.3d 829, 848
(Tex. 2000).  Therefore, we review de novo the district court=s decision to apply the Minnesota
useful life statute instead of the Texas statute of repose.  Minnesota Mining
& Mfg. Co. v. Nishika Ltd., 955 S.W.2d 853, 856 (Tex. 1996).

When the parties have not otherwise agreed by contract to a
valid choice of law clause, the law of the state with the most significant
relationship to the particular substantive issue will be applied.  Duncan v.
Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex. 1984).  Texas has adopted
the standards and factors set forth in sections 6 and 145 of the Restatement
(Second) of Conflict of Laws (1971) to determine choice of law in tort cases.  See
Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex. 1979).








ASection 6 sets out the general
principles by which the more specific rules are to be applied.@  Gutierrez, 583 S.W.2d at
318.  In turn, ASection 145 lists factual matters to be considered when
applying the principles of Section 6 to a tort case . . . .@  Id. at 319.  On appeal, Sico
invokes these provisions to argue that Texas=s statute of repose governs this case
because a statutory directive requires the application of Texas law under
section 6(1).  Alternatively, Sico argues that the factors under sections 6(2)
and 145 point to the application of Texas law.  We address each contention in
turn.

A.        Statutory
Directive

Section 6(1) states that A[a] court, subject to constitutional
restrictions, will follow a statutory directive of its own state on choice of
law.@  Restatement ' 6(1).  Sico argues on appeal that
section 71.031 of the Texas Civil Practice and Remedies Code establishes a
statutory directive to apply Texas law here.[4]

Sico did not raise this statutory directive argument in the
district court.  To the contrary, Sico affirmatively and repeatedly disclaimed
the existence of a statutory directive to apply Texas law.  Sico told the
district court that A[t]here is no statutory directive, so choice of law must be
determined by applying the >most significant relationship= analysis.@  We decline to address an argument
that was not asserted B and was affirmatively disclaimed B in the district court.  See,
e.g., Holland v. Hayden, 901 S.W.2d 763, 765 (Tex. App.BHouston [14th Dist.] 1995, writ
denied); Tex. R. App. P. 33.1(a).

B.        Most Significant
Relationship

In applying the most significant relationship test, this
court first must identify the relevant factors.








Under section 6(2), the following factors are relevant to the
choice of law determination:

(a)       the needs of the interstate and
international systems,

(b)       the relevant policies of the
forum,

(c)       the relevant policies of other
interested states and the relative interests of those states in the
determination of the particular issue,

(d)       the protection of justified
expectations,

(e)       the basic policies underlying
the particular field of law,

(f)        certainty, predictability and
uniformity of result, and

(g)       ease
in the determination and application of the law to be applied.

Restatement ' 6(2)(a)B(g).

Section 145 lists the factual matters to be considered when
applying section 6 to a tort case.  AThe rights and liabilities of the
parties with respect to an issue in tort are determined by the local law of the
state which, with respect to that issue, has the most significant relationship
to the occurrence and the parties under the principles states in ' 6.@  Restatement ' 145(1).  AThese contacts are to be evaluated
according to their relative importance with respect to the particular issue.@  Id. ' 145(2).   In that regard, the court
should consider the following factors:

(a)       the place where the injury
occurred,

(b)       the place where the conduct
causing the injury occurred,

(c)       the domicile, residence,
nationality, place of incorporation, and place of business of the parties, and

(d)       the
place where the relationship, if any, between the parties is centered.  

Restatement ' 145(2).  The number of contacts is not determinative;
rather, the contacts must be evaluated in light of state policies underlying
the particular substantive issue.  Duncan, 665 S.W.2d at 421.








Beginning with the section 145 factors, we note the injury
occurred in Texas to Willis, a Texas resident.  Sico is a Minnesota corporation
with its principal place of business in Minnesota.  It is undisputed that the
Pacer table at issue was designed, manufactured, and introduced into the stream
of commerce in Minnesota.  As discussed more fully below, there is no Arelationship@ between Willis and Sico.

Sico argues for the application of the Texas statute of
repose based in large part on Willis=s Texas residency and the location of
the accident in Texas.  Texas no longer uses the common law doctrine of lex
loci delicti, under which the place of injury determined choice of law.  Gutierrez,
583 S.W.2d at 318.  Place of injury now is just one of multiple factors to be
considered.  More importantly, place of injury is not an important contact when
C as in this case C the place of injury is fortuitous.  See
Torrington Co., 46 S.W.3d at 849 (citing Restatement ' 145 cmt. e).

Sico has sold more than 220,000 Pacer tables since 1969. 
Sico does not sell directly to end-users in the educational market; instead,
Sico sells its products to merchandise dealers who in turn sell to individual
buyers and school districts within their regions.  Customers who call Sico=s 800 telephone number are directed
to a dealer. This evidence establishes both (1) the lack of any
relationship between Sico and Willis that could be Acentered@ in Texas; and (2) the fortuity of
the place of injury in this case.  Under these circumstances, the place of
injury has little bearing on the analysis.  See Torrington Co., 46
S.W.3d at 849.  Similarly, Willis=s Texas residency is not dispositive. 
See Doctor v. Pardue, 186 S.W.3d 4, 12 (Tex. App.BHouston [1st Dist.] 2005, pet.
denied) (applying Wisconsin law governing charitable immunity in connection
with injuries sustained by Texas resident; A[t]he record indicates that
volunteers from all over the country participated in the [defendant=s] . . . convention and air show, and
any expectation by [the defendant] . . . that it might be immune from liability
for injuries sustained to participants, depending upon the residence of the
participants who were injured, would be unreasonable.@).








A more significant factor in this case is the place where
Sico=s injury-causing conduct occurred.  See
Restatement ' 145(2)(b).  AIn applying the factual matters to be considered under
section 145 . . . >the rights and liabilities of the parties with respect to
an issue in tort are determined by the local law of the state which, with
respect to that issue, has the most significant relationship to the
occurrence and the parties.=@  Crisman v. Cooper Indus.,
748 S.W.2d 273, 277 (Tex. App.BDallas 1988, writ denied) (original emphasis) (quoting
Restatement ' 145(1)).  As the Dallas Court of Appeals concluded, A[T]he >issue in tort= between appellant and appellee in
the present case is the design, manufacture, and placing in the stream of
commerce@ of a product alleged to have caused
injury.  Crisman, 748 S.W.2d at 277B78; see also Greenberg Traurig of
New York v. Moody, 161 S.W.3d 56, 73 (Tex. App.BHouston [14th Dist.] 2004, no pet.) (AGenerally, the state where the act or
omission occurs has a real interest in applying its law in order to implement
the state=s regulatory policy as reflected in that law.@).  The court=s conclusion in Crisman
applies with equal force here.

The Pacer table was designed and manufactured in Minnesota by
a Minnesota corporation having its principal place of business in Minnesota. 
While Sico vigorously disputes that its table is defective, Sico does not
dispute that the table entered the stream of commerce when it was shipped from
Minnesota after being manufactured there; according to Sico, its product Awas not defective upon its entry into
the Minnesota stream of commerce.@  There is no contention and no
evidence that the Pacer table was substantially changed after Sico shipped it
from Minnesota.  Therefore, this factor supports the application of Minnesota
law.  Cf. Perry v. Aggregate Plant Prods. Co., 786 S.W.2d 21, 24 (Tex.
App.BSan Antonio 1990,  writ denied)
(defendant=s action in placing cement silo into stream of commerce in Texas where it
was designed and manufactured was a factor supporting application of Texas
law).








Taken as a whole, the section 145 factors point to the
application of Minnesota=s useful life statute.  The Texas situs of injury is
fortuitous.  Willis and Sico had no relationship centered in Texas or anywhere
else.  The Aissue in tort@ is a Minnesota corporation=s conduct in designing,
manufacturing, and placing into the stream of commerce a Pacer table that
injured a student.  See Crisman, 748 S.W.2d at 277B78.  All of Sico=s conduct germane to this Aissue in tort@ occurred in Minnesota.

The Minnesota focus of Sico=s conduct pertaining to the Aissue in tort@ dovetails with analysis of the
policy factors identified in section 6.  Minnesota has a policy interest in
promoting the responsibility of Minnesota companies that operate in Minnesota
to design, make and distribute products.  See Danielson v. National Supply
Co., 670 N.W.2d 1, 8B9 (Minn. App. 2003); Fluck v. Jacobson Mach. Works, Inc.,
No. CX-98-1899, 1999 WL 153789 at *4 (Minn. App. March 23, 1999) (not released
for publication).  This point is illustrated by Fluck, in which the
Minnesota Court of Appeals refused to apply the Colorado statute of repose to a
claim against a Minnesota corporation that designed, manufactured and placed
its product into the stream of commerce in Minnesota.  Fluck, 1999 WL
153789 at *1.  The product injured a Colorado resident in an accident that
occurred in Colorado.  Id.  In Fluck, as in this case, applying
the Minnesota useful life statute allowed the case to proceed; applying
Colorado=s seven-year statute of repose would
have barred the claim.  The Minnesota Court of Appeals concluded as follows:  A[W]e can find no basis for a
Minnesota corporation manufacturing a product in Minnesota to have the benefit
of the protections of a statue of repose promulgated in Colorado.@  Id. at *4.








Sico points to Texas=s policy interest in establishing a
measure of repose for product manufacturers and sellers, and posits that the
statute serves as an inducement to conduct business in Texas.  See Burleson
v. Liggett Group Inc., 111 F. Supp. 2d 825, 829 (E.D. Tex. 2000).  This
contention does not go as far as Sico would suggest.  Although the Minnesota
useful life statute=s approach differs from a statute of repose establishing a
definite cut-off date beyond which litigation cannot be pursued, the underlying
concept is similar in that the defense is not tied to accrual of a particular
litigant=s cause of action.  Cf. Trinity
River Auth. v. URS Consultants, Inc.-Tex., 889 S.W.2d 259, 261, 263 (Tex.
1994) (AUnlike traditional limitations
provisions, which begin running upon accrual of a cause of action, a statute of
repose runs from a specified date without regard to accrual of any cause of
action@ and may Apotentially cut off a right of action
before it accrues@).

The differences identified in the operation of the Texas
statute of repose and the Minnesota useful life statute do not mean that Texas=s policy goals are being subordinated
or thwarted.  AGenerally speaking, application of another jurisdiction=s laws is not contrary to the forum
state=s fundamental public policy merely
because application of the other state=s law leads to a different result
from the result that would be obtained if the forum state=s law were applied.@  Nexen Inc. v. Gulf Interstate
Eng=g Co., 224 S.W.3d 412, 421 (Tex. App.BHouston [1st Dist.] 2006, no pet.)
(applying Alberta statute of repose rather than Texas statute of repose
pursuant to contractual choice of law provision).  A[I]f the public policies in the forum
state and [another state] . . . >are the same, different approaches do
not contravene [the policies] just because one [approach] is somewhat stricter
than the other.=@ Id. at  421 (quoting Chesapeake
Oper., Inc. v. Nabors Drilling USA, Inc., 94 S.W.3d 163, 178 (Tex. App.BHouston [14th Dist.] 2002, no
pet.)).  A[T]he fact that the other state=s law differs materially from that of
the forum state does not itself show that application of the other state=s law would offend Texas public
policy.@  Nexen, Inc., 224 S.W.3d at
421.  Sico cannot be surprised or unfairly prejudiced by the application of a
statute enacted by the state in which Sico is incorporated and manufactures its
products.  See Doctor, 186 S.W.3d at 12 (not-for-profit charitable
corporation incorporated under Wisconsin law Acould have no justified expectation@ that it would be governed by Texas
charitable immunity statute in connection with liability arising from corporation=s activities in Wisconsin).

Upon review of the pertinent contacts and the respective
interests of Minnesota and Texas, we conclude that Minnesota and Minnesota law
have the most significant relationship to the particular substantive issue
here.  Therefore, the district court did not err by applying the Minnesota
useful life statute in this case.  Sico=s first issue is overruled.

 








II.        Legal Sufficiency

Sico next challenges the legal sufficiency
of the evidence to support the jury=s Ayes@ answer to the
negligence question.

When analyzing legal sufficiency of the evidence, we must
consider the evidence in the light most favorable to the finding at issue and
indulge every reasonable inference that would support it.  See City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  If the evidence at
trial would enable reasonable and fair‑minded people to differ in their
conclusions, then the finder of fact must be allowed to do so.  See id. 
We must credit favorable evidence if a reasonable fact finder could do so, and
disregard contrary evidence unless a reasonable fact finder could not do so.  See
id.  We cannot substitute our judgment for that of the fact finder if the
evidence falls within this zone of reasonable disagreement. See id.

A.        Interplay
of Answers to Liability Questions

We first address Sico=s argument concerning the interplay
of the jury=s answers to the liability questions.  Quoting Toshiba International
Corporation v. Henry, 152 S.W.3d 774, 784 (Tex. App.BTexarkana 2004, no pet.), Sico
contends that Ait is not >logical= to hold a manufacturer liable for negligence when the
product is not defective.@








As a threshold matter, Sico runs afoul of Texas procedure
when it argues that the jury=s Ano@ answers on design and marketing defect are incompatible with
C and thus foreclose C a Ayes@ answer on negligence.  While Sico
does not phrase it as such, this is a contention that the jury=s answers irreconcilably conflict.  See,
e.g., Ford Motor Co. v. Miles, 141 S.W.3d 309, 315 (Tex. App.BDallas 2004, pet. denied).  Sico did
not object to the asserted conflict in the jury=s answers under Texas Rule of Civil
Procedure 295 before the jury was discharged.[5] 
Sico=s contention is unavailing in any
event.  The remedy for conflicting jury findings is a new trial C not the take-nothing judgment Sico
asks this court to render on appeal.  See id.[6]

Putting aside the proper remedy for conflicting jury
findings, Sico=s argument is problematic for another reason.  Sico=s argument assumes that the jury=s Ano@ answers to the design and marketing
defect questions are equivalent to affirmative findings that the Pacer table
lacked defects.  This assumption is unwarranted.  See Grenwelge v. Shamrock
Reconstructors, Inc., 705 S.W.2d 693, 694 (Tex. 1986) (jury=s failure to find breach of contract
meant the plaintiffs failed to carry burden of proof; it did not establish that
the defendant substantially performed the contract); Cullins v. Foster,
171 S.W.3d 521, 536B37 (Tex. App.BHouston [14th Dist.] 2005, pet. denied) (AIf the jury makes a negative finding
in answer to a question, it means the party with the burden of proof has failed
to carry its burden.@); Blizzard v. Nationwide Mut. Fires Ins. Co., 756
S.W.2d 801, 806 (Tex. App.BDallas 1988, no writ) (Athe jury=s negative answer does not establish
the contrary of the question asked@).  The jury=s Ano@ answers to design and marketing
defect questions do not conclusively establish the absence of defects and do
not demonstrate the absence of legally sufficient evidence to support a Ayes@ answer to a separate negligence
question.

Examined in this context, Toshiba International
Corporation does not support Sico=s no-evidence challenge or its
request for rendition of a take-nothing judgment on appeal.








AToshiba manufactured and sold to
Alcoa an inverter or controller that Alcoa integrated into a larger system.@  Toshiba Int=l Corp., 152 S.W.3d at 777.  The inverter
itself functioned as designed and was not defective; the plaintiff was injured
when his pants became entangled in the larger machine into which Alcoa had
installed the non-defective Toshiba inverter.  Id. at 777B78.  The jury uniformly answered Ayes@ to separate liability questions
based on design defect, marketing defect, and negligence.  Id. at 777. 
The appellate court concluded as a matter of law that Toshiba could not be
liable under a design defect theory as the seller of a non-defective component
that was incorporated into a larger defective product.  Id. at 779B83.  The appellate court also
rejected liability under a marketing defect theory because AToshiba, as a component seller, did
not have a duty to warn of the potential dangerous condition dependent on the
nature of integration into a system designed and assembled by another.@  Id. at 784.

Having concluded that the plaintiff=s design defect and marketing defect
theories failed as a matter of law as to the manufacturer of a non-defective
component, the court addressed the remaining negligence claim against Toshiba. 
AWe have held that, since the inverter
was a component of a larger system of which Toshiba had no participation in the
design, Henry=s injuries were not the result of a design defect or a marketing defect
for which Toshiba is responsible.@  Id. at 785.  ABefore a negligence theory can be
utilized in a products liability case, there must be proof of a defect in the
product.@  Id.  ABecause there is no defect for which
Toshiba is responsible, it necessarily follows that the negligence theory
cannot be upheld.@  Id.

Unlike the present case, these statements in Toshiba
International Corporation were made after the court already had concluded
that liability under design defect and marketing defect theories was foreclosed
as a matter of law based on the record.  The Texarkana Court of Appeals was not
asked to C and did not C treat Ano@ answers to jury questions on design defect and manufacturing
defect theories as affirmative findings that the product at issue was free of
defects.








Additionally, the court in Toshiba International
Corporation included an important qualification when making its
observations about the interplay of strict products liability and negligence
theories:  AThis assumes there is no other potentially negligent conduct in such
case.@  Id. at 784; see also
Miles, 141 S.W.3d at 315 (AThis analysis applies when a defective product theory
encompasses and subsumes negligence theory, that is, when the allegations and
evidence are directed to whether the product is >unreasonably dangerous= and no other potentially negligent
conduct is alleged or the subject of evidence@) (citing Garrett v. Hamilton
Standard Controls, Inc., 850 F.2d 253, 257 & n.8 (5th Cir. 1988)); Bender
v. S. Pac. Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980) (court cannot
strike down jury answers based on asserted conflict if there is any reasonable
basis upon which they can be reconciled).

Unlike the circumstances presented in Toshiba
International Corporation, the evidence here addresses negligent conduct by
Sico that is distinct from the asserted design and marketing defects.

B.        Legal
Sufficiency of Evidence to Support a AYes@ Answer on Negligence

Strict products liability focuses on whether the product was
sold in a defective condition that was unreasonably dangerous to the user; the
degree of care taken is irrelevant if the product is unreasonably dangerous.  Gonzales
v. Caterpillar Tractor Co., 571 S.W.2d 867, 871 (Tex. 1978).  Negligence,
in contrast, focuses on whether the manufacturer exercised ordinary care in
design and production of the product at issue.  Caterpillar Inc. v. Shears,
911 S.W.2d 379, 384 (Tex. 1995).  A negligence cause of action has three
elements: (1) a legal duty owed by one person to another, (2) a breach of that
duty, and (3) damages proximately caused by the breach.  D. Houston, Inc. v.
Love, 92 S.W.3d 450, 454 (Tex. 2002).








Willis=s products
liability claim was based on defective design and defective marketing
theories.  He asserted that Sico=s design was
defective because the lock bar did not keep the Pacer table in a tee-pee position
as it started to unfold, and because the fully unfolded table lacked a gap
between the two halves that would have prevented pinching injuries.  Willis
asserted that Sico=s marketing was defective because the warnings
provided with the table were inadequate and were not visible when the table was
being used.

As pleaded, Willis=s negligence claim
focused solely on Sico=s conduct in designing the Pacer table and
providing allegedly inadequate warnings.  However, testimony also was presented
without objection at trial addressing Sico=s failure to test
the lock bar.[7]

Walter Wagner, the custom products and
legal affairs manager for Sico, testified as Sico=s corporate
representative.  Wagner is a registered professional engineer who had worked
for Sico for 13 years as of the time of trial.  Before becoming the legal
affairs manager, Wagner worked in product development and was chosen to
represent the company because of his broad product knowledge of the tables
manufactured by Sico.

The Pacer table that injured Willis was
manufactured in 1985.  Although Wagner did not work at Sico in 1985, he
testified that (1) he was familiar with Sico=s current
manufacturing processes; and (2) those processes had not changed from the ones
used before he joined the company.

Wagner researched the Pacer table=s design and
manufacturing history; he also examined and tested the specific table at issue
during pretrial discovery.  Wagner tested the table no more than ten times
before trial.  In some of those tests the lock bar engaged to keep the table in
a tee-pee position; in others the lock bar failed to catch and allowed the
table to open fully without stopping.  On cross-examination, Wagner
acknowledged that the lock bar engaged during pretrial tests only when he
manually manipulated it; Wagner agreed with a statement that the subject table Anever worked right@ during his
pretrial tests.








Wagner concluded that the accident
occurred because the lock bar malfunctioned.  Wagner could not determine why
the lock bar failed to catch.  Wagner testified that the lock bar is supposed
to function properly 100 percent of the time without manipulation.  Wagner
testified that the table was in a dangerous condition at the time of trial.

Wagner testified at trial that the Pacer
table is opened during the manufacturing process for cleaning before it leaves
the factory.  Wagner testified that he was not aware of any testing that Sico did
on Pacer tables to determine if the lock bars function properly.  Wagner
further testified at trial that no testing had been conducted on the Pacer
table since he had been with the company.  He testified that Ait is a
possibility@ the table could malfunction after being stored for a
period of time, and that Sico had not conducted testing to assess the effect of
long-term storage on the lock bar=s functioning.  

Sico argues on appeal that the record
contains no evidence that failure to test the lock bar breached an industry
standard of care, or that Sico=s failure to test the lock bar proximately
caused Willis=s injury.  Sico is held to a standard of ordinary care
under the jury charge submitted in this case.  See Sage Street Assocs.,
863 S.W.2d at 447 (absent charge error complaint, sufficiency of the evidence
is assessed under the jury charge as given).  As defined in the jury charge, A>Ordinary care= means that degree
of care that would be used by a company . . . of ordinary prudence under the
same or similar circumstances.@

Wagner testified as follows:

Q.      Do you recall when I took your deposition, I asked
you whether you or anyone at SICO tested this product by letting it go before
it was shipped out?  Do you recall?

A.      Yes.

Q.      And do you recall at that time you told me that you
were not aware that anyone tested the product in that fashion?








A.      Yes.

Q.      Okay.  And are you telling the ladies and gentlemen
of the jury that what somebody at SICO does today is they may pull this down .
. . to wipe it off?

A.      Right.

Q.      Then they will pull it back up and send it away?

A.      Right.

Q.      But it is true that no one just does B and I am going to
let it catch B no one just does that, do they?

A.      Well, if the lock bar functions properly, it will
stop in that position.

Q.      Well, no one does what I just did, right?

A.      I don=t know how that=s different from
just opening the table.

Q.      Okay.  Well, you, as the guy for SICO, can=t tell the
difference or why it might be important for anyone working at the company to do
this, and they slowly let it down, versus just seeing what happens when it
falls?  You can=t see why that might be important?

A.      Well, like I said earlier, they do open the table
so that they can wipe it down and make sure it=s clean.

*     *     *

Q.      They don=t just let it drop
to see if the lock bar will catch, do they, sir?

A.      They would have to manually override the lock bar
in order for that not to happen.

Q.      If it worked, right?  If it worked?








A.      I am not sure what you are saying.  You have to
manually override the lock bar.  What you just did would automatically happen.

Wagner also testified as follows:

Q.      Okay.  And if John=s hand was there,
and that lock bar was working correctly, he wouldn=t have been
injured, correct?

A.      Yes.

*     *     *

Q.      What would happen if, say, in operating the table
that=s . . . about to
be packaged up and shipped out . . . they operate it and it doesn=t work, what would
happen then?

A.      It would be tagged and set aside until the problem
was corrected.

Q.      Okay, and what does the product being corrected
mean?  Do you B 

A.      Well, depending on what=s wrong, it could
be replacing parts, you know, whatever it takes to make it function correctly.








Although he testified at trial that the table was designed to
be used Auntil it gets into disrepair,@  Wagner testified in his deposition
that A[w]e expect people to use it until
probably they either damage the top or they get tired of the color.@  He agreed that the lock bar should
work 100 percent of the time, but repeatedly qualified that statement by
limiting its application to products that are well-maintained.  Wagner could
identify no maintenance that should be performed on the lock bar other than
perhaps to lubricate the pivot points; he agreed that lubrication should not
affect the lock bar=s functioning.  Wagner also testified that the lock bar=s operation could be affected if it
was bent or damaged, but he observed no such damage to the lock bar on the
table that injured Willis.  Wagner testified that he saw nothing unusual about
the table=s lock bar and he did not know why the lock bar failed to work correctly,
but stated he could make that determination if he disassembled it.  The lock
bar had no visible damage or rust and showed no indication that someone had
tampered with it.  The table showed no signs of misuse.  

Wagner testified that Aat some point, age is going to affect
how it operates.@  He agreed that Sico had never considered that the lock bar=s functionality might decrease over
time, but he agreed that functionality of this particular lock bar did, in
fact, deteriorate during the time that elapsed between Willis=s accident and the trial.  Wagner did
not know the reason for this.  He agreed it was possible that the change in the
product=s condition was simply the result of
storing it.

Wagner further agreed that Awhen you have a design feature, that
you expect it to work 100 percent of the time and it fails sometimes, that is
the most dangerous product of all.@  Finally, when Wagner examined the
table involved in this incident, he could not get the lock bar to Acatch@ automatically as it was intended to
do, despite the absence of any visible defect or damage.








Based on Wagner=s testimony, a reasonable jury could
conclude that no lock bar testing was performed before the table that injured
Willis left Sico=s factory.[8]  A reasonable jury
also could conclude that (1) a table manufacturer exercising ordinary prudence
under the same or similar circumstances would have tested Pacer tables for lock
bar malfunctions; (2) any lock bar malfunctions revealed by testing would have
been fixed; and (3) the failure to test for and fix lock bar malfunctions was a
proximate cause of the amputation injury that occurred when the lock bar on a
Pacer table failed to catch, allowing the table to open fully while Willis=s finger was
pinched between the table halves.

Conclusion

The trial court=s judgment is
affirmed.

 

 

/s/      William
J. Boyce

Justice

 

 

Panel consists of Justices Anderson, Guzman, and Boyce.

 









[1]  Sico asserts it was named incorrectly as ASico North America, Inc.@ in the district court.





[2]  When Willis was injured on May 2, 2003, the Texas
statute of repose applied only to manufacturing equipment.  See Act of
Feb. 24, 1993, 73rd Leg., R.S., ch. 5, ' 2,
1993 Tex. Gen. Laws 13, 14B15, amended
by Act of June 2, 2003, 78th Leg., R.S., ch. 204 ' 5.01, 2003 Tex. Gen. Laws 847, 859B60.  On June 2, 2003, the Texas legislature amended
the statute to apply to suits against manufacturers of any product.  Act of
June 2, 2003, 78th Leg., R.S., ch. 204, '
5.01, 2003 Tex. Gen. Laws 847, 859B60. 
The governor signed the bill into law on June 11, 2003, and it became effective
on September 1, 2003.  See id. ' 23.02(c),
2003 Tex. Gen. Laws at 898B99.  As
modified, the statute applies to actions filed on or after July 1, 2003.  Id.
 (AArticles 4, 5, and 8 of this Act apply to an action
filed on or after July 1, 2003.  An action filed before July 1, 2003, is
governed by the law in effect immediately before the change in law made by
Articles 4, 5, and 8, and that law is continued in effect for that purpose.@).  Thus, at the time the cause of action accrued,
Willis=s suit was not barred by the Texas statute of repose;
as a result of the amendment, he had less than four months within which to file
suit before the amendment became retroactively effective.





[3]  No other differences between Texas and Minnesota law
were identified in the district court, and the case otherwise was submitted to
the jury in conformity with Texas law. See Tex. R. Evid. 202.





[4]  Section 71.031, entitled AAct or Omission Out of State,@ provides in pertinent part:

(a) An action for damages for the death or personal
injury of a citizen of this state, of the United States, or of a foreign
country may be enforced in the courts of this state, although the wrongful act,
neglect, or default causing the death or injury takes place in a foreign state
or country, if:

(1)        a law of the
foreign state or country or of this state gives a right to maintain an action
for damages for the death or injury;

(2)        the action is
begun in this state within the time provided by the laws of this state for
beginning the action;

(3)        for a resident of
a foreign state or country, the action is begun in this state within the time
provided by the laws of the foreign state or country in which the wrongful act,
neglect, or default took place; and 

(4)        in the case of a citizen of a
foreign country, the country has equal treaty rights with the United States on
behalf of its citizens.





[5]  Several cases hold that the absence of an objection
before the jury is discharged waives a complaint regarding an asserted conflict
in jury findings.  Coastal Chem. Inc. v. Brown, 35 S.W.3d 90, 99 (Tex.
App.CHouston [14th Dist.] 2000, pet. denied); Sears, Roebuck & Co. v. Kunze, 996 S.W.2d 416, 423B24 (Tex. App.BBeaumont 1999, pet denied); City of Port Isabel v.
Shiba, 976 S.W.2d 856, 860 (Tex. App.BCorpus
Christi 1998, pet. denied); Torres v. Caterpillar, Inc., 928 S.W.2d 233,
244B45 (Tex. App.BSan
Antonio 1996, writ denied); Roling v. Alamo Group (USA), Inc., 840
S.W.2d 107, 109 (Tex. App.BEastland 1992,
writ denied); see also End Users, Inc. v. Sys. Supply for End Users, Inc.,
No. 14-06-00833-CV, 2007 WL 2790379, at *5 (Tex. App.CHouston [14th Dist.] Sept. 27, 2007, no pet.) (mem.
op.).  But see Kitchen v. Rusher, 181 S.W.3d 467, 472B73 (Tex. App.BFort
Worth 2005, no pet.).  We need not and do not address this preservation issue.





[6]  Sico predicated its motion for new trial in part on
the jury=s simultaneous Ano@ answers to the defect questions and Ayes@ answer to the
negligence question.  On appeal, Sico neither requests a new trial nor contends
that the district court erred in denying its motion for new trial.  With
respect to the negligence claim, Sico=s
brief challenges only the denial of its motion for directed verdict and its
motion for judgment notwithstanding the verdict. 





[7]  The admission of this testimony without objection
established trial by consent with respect to negligence predicated on an
unpleaded failure to test the table and lock bar.  AWhen both parties present evidence on an issue and the
issue is developed during trial without objection, any defects in the pleadings
are cured at trial, and the defects are waived.@  Ingram v. Deere, ___ S.W.3d ___, 2009 WL 1900537 *2  (Tex.
July 3, 2009) (not yet released for publication) (citing Sage Street Assocs.
v. Northdale Constr. Co., 863 S.W.2d 438, 445B46 (Tex. 1993), and Tex. R. Civ. P. 67).





[8]  Wagner testified as follows:

Q:         Let
me make sure I understand one other area and that=s testing.  To your knowledge, has anybody done even the smallest
amount of testing on this lock bar for this table ever at SICO?

A:         I
don=t know if it=s
been done.

Q:         Certainly
since you have been at the company, you are aware that it has not been done,
correct?

A:         I
couldn=t say that definitively, but I don=t recall it being done.

Q:         In
your position as legal affairs manager for the company and someone who=s been there for, what, now 13 years?

A:         Thirteen
years.

Q:         -
- 13 years, you are not aware of it ever being done, correct?

A:         Correct.